PUTNAM ET UX. *v.* COMMISSIONER OF
INTERNAL REVENUE.

No. 25.   Argued October 17, 1956.—Decided December 3, 1956.

*Richard E. Williams* argued the cause for petitioners. With him on the brief was *A. Lyman Beardsley.*

*Philip Elman* argued the cause for respondent. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Rice, Harry Baum* and *Joseph F. Goetten.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The petitioner, Max Putnam, in December 1948, paid $9,005.21 to a Des Moines, Iowa, bank in discharge of his obligation as guarantor of the notes of Whitehouse Publishing Company. That corporation still had a corporate existence at the time of the payment but had ceased doing business and had disposed of its assets eighteen months earlier. The question for decision is whether, in the joint income tax return filed by Putnam and his wife for 1948, Putnam's loss is fully deductible as a loss "incurred in [a] transaction . . . for profit, though not connected with [his] trade or business" within the meaning of § 23 (e)(2) of the Internal Revenue Code of 1939,[1] or whether it is a nonbusiness bad debt within the

---

[1] "SEC. 23. DEDUCTIONS FROM GROSS INCOME.

"In computing net income there shall be allowed as deductions:

.           .           .           .           .

"(e) LOSSES BY INDIVIDUALS.—In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

.           .           .           .           .

"(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; . . . ." 53 Stat. 13, 26 U. S. C. § 23 (e)(2).

meaning of § 23 (k)(4) of the Code,[2] and therefore deductible only as a short-term capital loss.

The Commissioner determined that the loss was a nonbusiness bad debt to be given short-term capital loss treatment. The Tax Court[3] and the Court of Appeals[4] for the Eighth Circuit sustained his determination. Because of an alleged conflict with decisions of the Courts of Appeals of other circuits,[5] we granted certiorari.[6]

Putnam is a Des Moines lawyer who in 1945, in a venture not connected with his law practice,[7] organized Whitehouse Publishing Company with two others, a newspaperman and a labor leader, to publish a labor newspaper. Each incorporator received one-third of the issued capital stock, but Putnam supplied the property and cash with which the company started business. He also financed its operations, for the short time it was in business, through advances and guarantees of payment of salaries and debts.

---

[2] "SEC. 23. DEDUCTIONS FROM GROSS INCOME.

.        .        .        .        .

"(k) BAD DEBTS.—

.        .        .        .        .

"(4) NON-BUSINESS DEBTS.—In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term 'non-business debt' means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." 53 Stat. 13, 56 Stat. 820, 26 U. S. C. § 23 (k)(4).

[3] 13 CCH TC Mem. Dec. 458.

[4] 224 F. 2d 947.

[5] *Pollak* v. *Commissioner*, 209 F. 2d 57 (C. A. 3d Cir.); *Edwards* v. *Allen*, 216 F. 2d 794 (C. A. 5th Cir.); *Cudlip* v. *Commissioner*, 220 F. 2d 565 (C. A. 6th Cir.).

[6] 350 U. S. 964.

[7] Petitioners abandoned in this Court the alternative contention made below that the loss was deductible in full as a business bad debt under § 23 (k)(1).

Just before the venture was abandoned, Putnam acquired the shares held by his fellow stockholders and in July 1947, as sole stockholder, wound up its affairs and liquidated its assets. The proceeds of sale were insufficient to pay the full amount due to the Des Moines bank on two notes given by the corporation and guaranteed by Putnam for moneys borrowed in August 1946 and March 1947.

The familiar rule is that, *instanter* upon the payment by the guarantor of the debt, the debtor's obligation to the creditor becomes an obligation to the guarantor, not a new debt, but, by subrogation, the result of the shift of the original debt from the creditor to the guarantor who steps into the creditor's shoes.[8] Thus, the loss sustained by the guarantor unable to recover from the debtor is by its very nature a loss from the worthlessness of a debt. This has been consistently recognized in the administrative and the judicial construction of the Internal Revenue laws[9] which, until the decisions of the

---

[8] *United States* v. *Munsey Trust Co.*, 332 U. S. 234, 242; *Aetna Life Ins. Co.* v. *Middleport*, 124 U. S. 534, 548; *Howell* v. *Commissioner;* 69 F. 2d 447, 450; *Scott* v. *Norton Hardware Co.*, 54 F. 2d 1047; Brandt, Suretyship and Guaranty (3d ed.), § 324; 38 C. J. S., Guaranty, § 111; 24 Am. Jur., Guaranty, § 125. Iowa follows this rule. *Randell* v. *Fellers*, 218 Iowa 1005, 252 N. W. 787; *American Surety Co.* v. *State Trust & Sav. Bank*, 218 Iowa 1, 254 N. W. 338. There is not involved here a question of the effect of state law upon federal tax treatment of Putnam's loss. Cf. *Watson* v. *Commissioner*, 345 U. S. 544; *Lyeth* v. *Hoey*, 305 U. S. 188; *Burnet* v. *Harmel*, 287 U. S. 103.

[9] The bad debt deduction provisions of earlier Revenue Acts were enacted in § 214 (a) (7) of the Revenue Act of 1921, 42 Stat. 239; § 214 (a) (7) of the Revenue Act of 1924, 43 Stat. 269; § 214 (a) (7) of the Revenue Act of 1926, 44 Stat. 26; § 23 (j) of the Revenue Act of 1928, 45 Stat. 799; § 23 (j) of the Revenue Act of 1932, 47 Stat. 179; § 23 (k) of the Revenue Act of 1934, 48 Stat. 688; § 23 (k) of the Revenue Act of 1936, 49 Stat. 1658; § 23 (k) of the Revenue Act of 1938, 52 Stat. 460; and § 23 (k) of the Internal Revenue Code of 1939, 53 Stat. 12.

Courts of Appeals in conflict with the decision below, have always treated guarantors' losses as bad debt losses.[10] The Congress recently confirmed this treatment in the Internal Revenue Code of 1954 by providing that a payment by a noncorporate taxpayer in discharge of his obligation as guarantor of certain noncorporate obligations "shall be treated as a debt." [11]

---

[10] See, e. g., 2 Cum. Bull. 137; 5 Cum. Bull. 146; III–1 Cum. Bull. 158; III–1 Cum. Bull. 166; Shiman v. Commissioner, 60 F. 2d 65 (C. A. 2d Cir.); Hamlen v. Welch, 116 F. 2d 413 (C. A. 1st Cir.); Gimbel v. Commissioner, 36 B. T. A. 539; Roberts v. Commissioner, 36 B. T. A. 549; Sharp v. Commissioner, 38 B. T. A. 166; Hovey v. Commissioner, P–H 1939 B. T. A. Mem. Dec. ¶39,081; Pierce v. Commissioner, 41 B. T. A. 1261; Whitcher v. Welch, 22 F. Supp. 763.

Similar decisions rendered since the Revenue Act of 1942 include: Ortiz v. Commissioner, 42 B. T. A. 173, reversed on another ground, sub nom. Helvering v. Wilmington Trust Co., 124 F. 2d 156, reversed (without discussion on this point), 316 U. S. 164; Burnett v. Commissioner, P–H 1942 B. T. A. Mem. Dec. ¶42,528; Ritter v. Commissioner, P–H 1946 TC Mem. Dec. ¶46,237; Greenhouse v. Commissioner, P–H 1954 TC Mem. Dec. ¶54,250; Estate of Rosset v. Commissioner, P–H 1954 TC Mem. Dec. ¶54,346; Watson v. Commissioner, 8 T. C. 569; Sherman v. Commissioner, 18 T. C. 746; Aftergood v. Commissioner, 21 T. C. 60; Stamos v. Commissioner, 22 T. C. 885.

[11] "SEC. 166. BAD DEBTS.

. . . . .

"(f) GUARANTOR OF CERTAIN NONCORPORATE OBLIGATIONS.—A payment by the taxpayer (other than a corporation) in discharge of part or all of his obligation as a guarantor, endorser, or indemnitor of a noncorporate obligation the proceeds of which were used in the trade or business of the borrower shall be treated as a debt becoming worthless within such taxable year for purposes of this section (except that subsection (d) shall not apply), but only if the obligation of the borrower to the person to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) at the time of such payment." 68A Stat. 50, 26 U. S. C. § 166 (f). And see 65 Yale L. J. 247.

There is, then, no justification or basis for consideration of Putnam's loss under the general loss provisions of § 23 (e)(2), *i. e.*, as an ordinary nonbusiness loss sustained in a transaction entered into for profit. Congress has legislated specially in the matter of deductions of nonbusiness bad debt losses, *i. e.*, such a loss is deductible only as a short-term capital loss by virtue of the special limitation provisions contained in § 23 (k)(4). The decision of this Court in *Spring City Co.* v. *Commissioner,* 292 U. S. 182, is apposite and controlling. There it was held that a debt excluded from deduction under § 234 (a)(5) of the Revenue Act of 1918 was not to be regarded as a loss deductible under § 234 (a)(4). Chief Justice Hughes said for the Court:

> "Petitioner also claims the right of deduction under § 234 (a)(4) of the Act of 1918 providing for the deduction of 'Losses sustained during the taxable year and not compensated for by insurance or otherwise.' We agree with the decision below that this subdivision and the following subdivision (5) relating to debts are mutually exclusive. We so assumed, without deciding the point, in *Lewellyn* v. *Electric Reduction Co.,* 275 U. S. 243, 246. The making of the specific provision as to debts indicates that these were to be considered as a special class and that losses on debts were not to be regarded as falling under the preceding general provision. What was excluded from deduction under subdivision (5) cannot be regarded as allowed under subdivision (4). If subdivision (4) could be considered as ambiguous in this respect, the administrative construction which has been followed from the enactment of the statute— that subdivision (4) did not refer to debts—would be entitled to great weight. We see no reason for disturbing that construction." 292 U. S., at 189.

Here also the statutory scheme is to be understood as meaning that a loss attributable to the worthlessness of a debt shall be regarded as a bad debt loss, deductible as such or not at all.

The decisions of the Courts of Appeals in conflict with the decision below turn upon erroneous premises.[12] It is said that the guarantor taxpayer who involuntarily acquires a worthless debt is in a position no different from the taxpayer who voluntarily acquires a debt known by him to be worthless. The latter is treated as having acquired no valid debt at all.[13] The situations are not analogous or comparable. The taxpayer who voluntarily buys a debt with knowledge that he will not be paid is rightly considered not to have acquired a debt but to have made a gratuity. In contrast the guarantor pays the creditor in compliance with the obligation raised by the law from his contract of guaranty. His loss arises not because he is making a gift to the debtor but because the latter is unable to reimburse him.

Next it is assumed, at least in the *Allen* case, that a new obligation arises in favor of the guarantor upon his payment to the creditor. From that premise it is argued that such a debt cannot "become" worthless but is worthless from its origin, and so outside the scope of § 23 (k). This misconceives the basis of the doctrine of subrogation, apart from the fact that, if it were true that the debt did not "become" worthless, the debt nevertheless would not be regarded as an ordinary loss under § 23 (e). *Spring City Co.* v. *Commissioner, supra.* Under the doctrine of subrogation, payment by the guarantor, as we have seen, is treated not as creating a new debt and extinguishing the original debt, but as preserving the original debt and

[12] See n. 5, *supra.*

[13] *Reading Co.* v. *Commissioner,* 132 F. 2d 306; *W. F. Young, Inc.* v. *Commissioner,* 120 F. 2d 159; *American Cigar Co.* v. *Commissioner,* 66 F. 2d 425.

merely substituting the guarantor for the creditor. The reality of the situation is that the debt is an asset of full value in the creditor's hands because backed by the guaranty. The debtor is usually not able to reimburse the guarantor and in such cases that value is lost at the instant that the guarantor pays the creditor. But that this instant is also the instant when the guarantor acquires the debt cannot obscure the fact that the debt "becomes" worthless in his hands.

Finally, the Courts of Appeals found support for their view in the following language taken from the opinion of this Court in *Eckert* v. *Burnet,* 283 U. S. 140:

> "The petitioner claims the right to deduct half that sum as a debt 'ascertained to be worthless and charged off within the taxable year,' under the Revenue Act of 1926, c. 27, § 214 (a)(7); 44 Stat. 9, 27.
>
> "It seems to us that the Circuit Court of Appeals sufficiently answered this contention *by remarking that the debt was worthless when acquired. There was nothing to charge off.* The petitioner treats the case as one of an investment that later turns out to be bad. But in fact it was the satisfaction of an existing obligation of the petitioner, having, it may be, the consequence of a momentary transfer of the old notes to the petitioner in order that they might be destroyed. It is very plain we think that the words of the statute cannot be taken to include a case of that kind." 283 U. S., at 141. (Emphasis added.)

That statement did not imply a determination by this Court that the guarantor's loss was not to be treated as a bad debt.[14] This Court was not faced with the ques-

[14] The basis for this statement came from the opinion of the Court of Appeals for the Second Circuit and was explained by that court in its later opinion in *Shiman* v. *Commissioner,* 60 F. 2d 65, 67, as follows:

tion in *Eckert*. The point decided by the case was that a guarantor reporting on a cash basis and discharging his guaranty, not by a cash payment, but by giving the creditor his promissory note payable in a subsequent year, was not entitled to a bad debt loss deduction in the year in which he gave the note. The true significance of the quoted language is that, although "the debt was worthless when acquired," it could not be "charged off" within the taxable year as the promissory note given for its payment was not paid or payable within that year.[15]

The objectives sought to be achieved by the Congress in providing short-term capital loss treatment for nonbusiness bad debts are also persuasive that § 23 (k)(4) applies to a guarantor's nonbusiness debt losses. The

"Though there was no debt until Shiman paid the brokers, it then became such at once and was known to be worthless as soon as it arose; verbally at any rate there is no difficulty. Nor is there any reason to impute a purpose to except such cases; the loss is as real and unavoidable as though the debt had had some value for a season. The analogy of section 204 (b) is apt. We can see no ground therefore for question except some of the language used in Eckert v. Burnet, 283 U. S. 140, 51 S. Ct. 373, 75 L. Ed. 911, taken from our opinion in 42 F. (2d) 158. That was quite another situation. Eckert, the taxpayer, had been an accommodation endorser for a corporation which became insolvent. When called upon to pay he gave his note instead, not payable within the year. The court refused to allow the deduction, because Eckert was keeping his books on a cash basis, but it intimated that when he paid he might succeed; until then he had done no more than change the form of the obligation. Yet if it were enough to defeat him that the debt was 'worthless when acquired,' the same objection ought to be good after he had paid; contrary to what was suggested. We cannot therefore think that the language so thrown out was intended as an authoritative statement by which we must be bound."

[15] See *Helvering* v. *Price*, 309 U. S. 409. The requirement that the debt be "ascertained to be worthless and charged off within the taxable year" was superseded in the Revenue Act of 1942, § 124 (a), by the requirement that the debt be one which "becomes worthless within the taxable year."

section was part of the comprehensive tax program enacted by the Revenue Act of 1942 to increase the national revenue to further the prosecution of the great war in which we were then engaged.[16] It was also a means for minimizing the revenue losses attributable to the fraudulent practices of taxpayers who made to relatives and friends gifts disguised as loans.[17] Equally, however, the

---

[16] Chairman Doughton of the House Committee on Ways and Means opened the hearings on the bill which became the Revenue Act of 1942 with the statement: ". . . the meeting of the committee this morning is the first step in the consideration, preparation, and reporting of perhaps the largest tax bill that it has ever been the duty and responsibility of our committee to report.

"We are faced with revenue needs and a tax program of a magnitude unthought of in modern times, and we all realize it is necessary to raise every dollar of additional revenue that can be raised without seriously disturbing or shattering our national economy." Hearings before House Committee on Ways and Means on Revenue Revision of 1942, 77th Cong., 2d Sess. 1.

[17] Petitioners argue that this was its sole purpose and that the section should be construed as limited in application to such loans. The context of the segment of the House Ways and Means Committee Report discussing this objective does not support the petitioners' argument. H. R. Rep. No. 2333, 77th Cong., 2d Sess. 45:

"C. NONBUSINESS BAD DEBTS

"The present law gives the same tax treatment to bad debts incurred in nonbusiness transactions as it allows to business bad debts. *An example* of a nonbusiness bad debt would be an unrepaid loan to a friend or relative, while business bad debts arise in the course of the taxpayer's trade or business. This liberal allowance for nonbusiness bad debts has suffered considerable abuse through taxpayers making loans which they do not expect to be repaid. This practice is particularly prevalent in the case of loans to persons with respect to whom the taxpayer is not entitled to a credit for dependents. This situation has presented serious administrative difficulties because of the requirement of proof.

"The bill treats the loss from nonbusiness bad debts as a short-term capital loss. The effect of this provision is to take the loss fully into account, but to allow it to be used only to reduce capital gains. Like any other capital loss, however, the amount of such bad

plan was suited to put nonbusiness investments in the form of loans on a footing with other nonbusiness investments. The proposal originated with the Treasury Department, whose spokesman championed it as a means "to insure a fairer reflection of taxable income," [18] and the House Ways and Means Committee Report stated that the objective was "to remove existing inequities and to improve the procedure through which bad-debt deductions are taken." [19] We may consider Putnam's case in the light of these revealed purposes. His venture into the publishing field was an investment apart from his law practice. The loss he sustained when his stock became worthless, as well as the losses from the worthlessness of the loans he made directly to the corporation, would receive capital loss treatment; the 1939 Code so provides as to nonbusiness losses both from worthless stock investments and from loans to a corporation, whether or not the loans are evidenced by a security.[20] It is clearly a "fairer reflection" of Putnam's 1948 taxable income to treat the instant loss similarly. There is no real or economic difference between the loss of an investment made in the form of a direct loan

debt losses may be taken to the extent of $1,000 against ordinary income and the 5-year carry-over provision applies." (Emphasis added.)

[18] Hearings before House Committee on Ways and Means on Revenue Revision of 1942, 77th Cong., 2d Sess. 90.

[19] H. R. Rep. No. 2333, 77th Cong., 2d Sess. 44.

[20] Section 23 (g) (2) and (3) as to worthless stock. Section 23 (k) (2) (3) and (4) as to loans. As Judge Stewart pointed out in his dissenting opinion in the *Cudlip* case, 220 F. 2d, at 572:

"Had the petitioner made the necessary additional investment in the conventional form of subscribing for stock, his loss upon the failure of the corporation would have been a capital loss, § 23 (g) (2), I. R. C. Had he made the investment in the form of a loan to the corporation evidenced by an instrument bearing interest coupons, his loss would likewise have been a capital loss, § 23 (k) (2), I. R. C. Had he made the additional investment in the form of an ordinary

to a corporation and one made indirectly in the form of a guaranteed bank loan. The tax consequences should in all reason be the same, and are accomplished by § 23 (k)(4).[21]   The judgment is

*Affirmed.*

Mr. Justice Harlan, dissenting.

Being unreconciled to the Court's decision, which settles a conflict on this tax question among the Courts of Appeals and thus has an impact beyond the confines of this particular case, I must regretfully dissent.

The Court's approval of the Commissioner's treatment of petitioner's loss as one arising from a "nonbusiness debt," within the meaning of § 23 (k)(4) of the Internal Revenue Code of 1939,[1] instead of as a loss incurred in a

loan to the corporation, his loss would likewise have been a capital loss, § 23 (k)(4) I. R. C., Commissioner of Internal Revenue v. Smith, supra.

"Because the petitioner happened instead to risk his money by guaranteeing the corporation's bank loans, the court now holds that the petitioner may take an ordinary loss, deductible in full from his ordinary income. Yet from the petitioner's viewpoint, the situation would have been precisely the same had he himself borrowed the money and then lent it to the corporation. It therefore seems to me that the result reached by the court in this case is significantly unrealistic."

[21] Upon this ground, contrary to the holding in *Fox* v. *Commissioner*, 190 F. 2d 101, the guarantor's nonbusiness loss would receive short-term capital loss treatment despite the nonexistence of the debtor at the time of the guarantor's payment to the creditor.

[1] "[§ 23 (k)] (4) Non-business debts.

"In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term 'non-business debt' means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business."

"transaction entered into for profit," under § 23 (e)(2),[2] rests on what is, in my opinion, a strained application of the equitable doctrine of subrogation. No one contends that petitioner acquired the Company's debt to the lending Bank when he entered into the agreement guaranteeing payment of that indebtedness. Rather, the Government's basic argument, as taken from its brief, is this:

"The principle is well established, both generally and in the State of Iowa [where the guaranty was executed and performed], that a guarantor who is required to make payment under his guaranty contract succeeds to the rights of the creditor by subrogation. The law implies a promise on the part of the principal debtor to reimburse the guarantor, and the guarantor's payment is treated not as extinguishing the debt but as merely substituting the guarantor for the creditor. . . . Accordingly, while a guarantor by entering into the guaranty contract and making payment thereunder puts himself in a position where he may sustain a loss, it is only if, and to the extent that, the debt which he acquires by subrogation is worthless that he actually sustains a loss. Thus, if the guarantor, having made payment under his guaranty contract, is able to recover in full from the principal debtor, he clearly suffers no loss at all. It follows, therefore, that any loss, the existence and extent of which is wholly and directly dependent

---

[2] "§ 23. DEDUCTIONS FROM GROSS INCOME.
"In computing net income there shall be allowed as deductions:

.        .        .        .        .

"(e) LOSSES BY INDIVIDUALS.
"In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

.        .        .        .        .

"(2) if incurred in any transaction entered into for profit, though not connected with the trade or business . . . ."

upon the worthlessness of a debt, should be attributed to the worthlessness of that debt, *i. e.,* should be considered a bad debt loss."

The Government then adds this footnote: "So long as payment of a debt is guaranteed by a solvent guarantor, the insolvency of the principal debtor obviously does not render the debt worthless. Consequently, if the debt which a guarantor acquires by subrogation becomes worthless, it necessarily becomes worthless in the hands of the guarantor rather than in the hands of the original creditor."

Upon analysis, the Government's argument comes down to this: when the petitioner honored his guaranty obligation his payment was offset by the acquisition of the creditor Bank's rights against the Company on its indebtedness; in the Bank's hands those rights were worth full value, since the Company's indebtedness was secured by the guaranty; therefore petitioner's loss should be attributed to the subrogation debt, which became worthless in his hands because no longer so secured.

This argument would have substance in a case where the principal debtor was not insolvent at the time the guaranty was fulfilled; for in such a case it could be said that the acquired debt was not without value in the guarantor's hands, and hence he should not be allowed a tax deduction until the debt turns out to be worthless. But when, as here, the debtor is insolvent at the very time the guarantor meets his obligation, it defies reality to attribute the guarantor's loss to anything other than the discharge of his guaranty obligation. To attribute that loss to the acquired debt in such a case requires one to conceive of the debt as having value at the moment of acquisition, but as withering to worthlessness the moment the guarantor touches it. That the same debt in the same millisecond can have both of these antagonistic

characteristics is, for me, too esoteric a concept to carry legal consequences, even in the field of taxation.

It was this departure from reality which first led the Court of Appeals for the Second Circuit to reject the Commissioner's theory, as applied to a loss incurred by a widow upon a guaranty of her husband's brokerage account which she was called upon to honor long after his death and the winding up of his insolvent estate. *Fox* v. *Commissioner,* 190 F. 2d 101. In that case the court, after referring to the "illusory character" of the subrogation claim which, the Tax Court held, she had acquired against her late husband upon her payment of the guaranty, went on to say, at pp. 103–104:

> "She [the widow] argues that the court's theory of a debt against her husband's estate amounts to a subrogation forced upon her, contrary to the equitable spirit of the doctrine, to yield her an utterly worthless claim and a very real tax liability. . . . [W]e think her argument persuasive. . . . Clearly . . . the [guaranty] transaction was not then one involving a bad debt, since she had not even made the payment which alone would give rise to a claim in her favor. Nor could payment ten years later create a debt out of something less than even the proverbial stone. It is utterly unrealistic to consider the payment as one made in any expectation of recovery over or of any legal claim for collection. Actually it was merely the fulfillment of her contractual obligation of the earlier date. The bad-debt provision thus had no direct application; only by straining the statutory language can we erect here a disembodied debt against an insolvent and long dead debtor."

Being unable to differentiate the worthlessness of a subrogation debt claim against a nonexistent individual

debtor from such a claim against an existent, but insolvent, corporate debtor, the Courts of Appeals, until the present case,[3] have consistently applied the reasoning of the *Fox* case to losses incurred on individual guaranties of corporate indebtedness where the corporation, though still in existence, was insolvent at the time the guaranty was honored. *Pollak* v. *Commissioner,* 209 F. 2d 57;[4] *Edwards* v. *Allen,* 216 F. 2d 794;[5] *Cudlip* v. *Commissioner,* 220 F. 2d 565;[6] see also *Ansley* v. *Commissioner,* 217 F. 2d 252.[7] The rationale of these four Courts of Appeals is, in my opinion, more convincing than that of the Commissioner, and I think this Court should have approved and followed it here by holding that this taxpayer's loss was fully deductible under § 23 (e)(2) as a loss on a "transaction entered into for profit," instead of regarding it as a "nonbusiness debt" loss, subject to capital loss treatment under § 23 (k)(4).

I cannot agree with the Court that either the circumstances under which § 23 (k)(4) was enacted in 1942, or the provisions of § 166 (f) of the Internal Revenue Code of 1954,[8] point to an opposite conclusion. Section 23 (k)(4) created a new category of debt losses, namely,

---

[3] 224 F. 2d 947.

[4] Third Circuit.

[5] Fifth Circuit.

[6] Sixth Circuit.

[7] Third Circuit.

[8] "[§ 166] (f) GUARANTOR OF CERTAIN NONCORPORATE OBLIGATIONS.—A payment by the taxpayer (other than a corporation) in discharge of part or all of his obligation as a guarantor, endorser, or indemnitor of a noncorporate obligation the proceeds of which were used in the trade or business of the borrower shall be treated as a debt becoming worthless within such taxable year for purposes of this section (except that subsection (d) shall not apply), but only if the obligation of the borrower to the person to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) at the time of such payment."

"nonbusiness debt" losses, which were thenceforth to be given capital loss treatment instead of the full loss deduction theretofore accorded them.[9] The Court finds the "objectives sought to be achieved by the Congress," through the enactment of this section, "persuasive that § 23 (k) (4) applies to a guarantor's nonbusiness debt losses," in that the "section was part of the comprehensive tax program enacted by the Revenue Act of 1942 to increase the national revenue," in connection with World War II, and "was suited to put nonbusiness investments in the form of loans on a footing with other nonbusiness investments." But it seems to me that the House Ways and Means Committee Report on the bill shows that § 23 (k) (4) was aimed at a specific narrow objective, namely, that of reducing revenue loss from the deduction of "family" or "friendly" loans which were in reality gifts. The Report states:

> "C. Nonbusiness Bad Debts.
>
> "The present law gives the same tax treatment to bad debts incurred in nonbusiness transactions as it allows to business bad debts. An example of a nonbusiness bad debt would be an unrepaid loan to a friend or relative, while business bad debts arise in the course of the taxpayer's trade or business. This liberal allowance for nonbusiness bad debts has suffered considerable abuse through taxpayers making loans which they do not expect to be repaid. This practice is particularly prevalent in the case of loans to persons with respect to whom the taxpayer is not entitled to a credit for dependents. This situation has presented serious administrative difficulties because of the requirement of proof.

---

[9] I. R. C., 1939, § 23 (k) (1), 53 Stat. 13, 26 U. S. C. (1940 ed.) § 23 (k) (1).

> "The bill treats the loss from nonbusiness bad debts as a short-term capital loss. The effect of this provision is to take the loss fully into account, but to allow it to be used only to reduce capital gains. Like any other capital loss, however, the amount of such bad debt losses may be taken to the extent of $1,000 against ordinary income and the 5-year carry-over provision applies." [10]

I am unable to find in this, or in any of the other legislative history to which the Court refers, any clear intimation of a broad policy to analogize generally all types of nonbusiness loans to other forms of capital investment,[11] still less anything which indicates that guarantors' losses were considered as falling within the new section.[12]

Likewise I think that the Court's reliance on § 166 (f) of the 1954 Code is misplaced. That section provides that an individual taxpayer's guaranty payment discharging the obligation of a noncorporate debtor "shall be treated as a debt becoming worthless within such taxable year," and shall be deductible in full if (a) the proceeds of the guaranteed obligation were used "in the trade or business of the borrower," and (b) that obligation was worthless at the time the guarantor made payment.[13] The Court says that by enacting this section Congress confirmed the administrative practice of treating guarantors' losses as

---

[10] H. R. Rep. No. 2333, 77th Cong., 2d Sess. 45.

[11] Had this been the congressional purpose, it could have been accomplished simply by subjecting nonbusiness debt losses to the provisions of the statute dealing with worthless securities. See § 23 (g) (2)–(4) of the Internal Revenue Code of 1939.

[12] When it enacted § 23 (k) (4) Congress left undisturbed § 23 (e) (2) relating to the deductibility of losses on "any transaction entered into for profit," and that section was subsequently re-enacted, unchanged, as § 165 (c) (2) of the Internal Revenue Code of 1954.

[13] See note 8, *supra*.

bad debt losses, at least so far as guaranties of certain noncorporate obligations are concerned. I cannot agree, for again I think this section had a specific and limited purpose, which did not include the thrust which the Court now gives the section. That purpose, I think, was simply to permit deduction of certain guaranty payments that were not deductible at all under the 1939 Code. Payments now deductible under § 166 (f) need not be made in the course of the guarantor's "trade or business," nor need they be attributable to a transaction "entered into for profit." They are deductible, it would seem, so long as the guarantor had some expectation of being repaid—so long, in other words, as the transaction was not a gift. Under prior law, such payments would not have been deductible as "business" debts, under § 23 (k)(1),[14] or as losses on transactions "entered into for profit," under § 23 (e)(2), or even as "nonbusiness" debts under § 23 (k)(4), since the *Fox* line of cases held that such payments do not give rise to "debts." However, here again, as with the enactment of the § 23 (k)(4) "nonbusiness debt" provision in 1942, Congress was concerned with fending against allowance of this type of deduction in cases of fictitious "family" or "friendly" guaranties. Hence it was unwilling to allow the deduction to *all* guarantors of individual borrowings. Considering guaranties of loans sought for business purposes to be free of such infirmities, Congress attempted to obviate abuse of § 166 (f) by limiting its

---

[14] "§ 23. DEDUCTIONS FROM GROSS INCOME.

"In computing net income there shall be allowed as deductions:

    .        .        .        .        .

"(k) BAD DEBTS.

"(1) GENERAL RULE.

"Debts which become worthless within the taxable year . . . . This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this subsection."

application to guaranties of loans the proceeds of which "were used in the trade or business of the borrower."

In light of what seems to have been the particular congressional purpose, I think it strains § 166 (f) to read it as broadly confirming the treatment of guaranty losses as bad debt losses.[15] Congress presumably knew of the *Fox* line of cases, *supra,* which had refused "debt" treatment to guarantors' losses, and it is not without significance that the Senate Report on § 166 (f) stated: "If the requirements of this section are not met, the taxpayer will, *as under present law,* be treated taxwise under whatever provisions of the code are applicable in the factual situation." [16] It is true that § 166 (f) provides that any payment included therein "shall be treated as a debt"; but of more significance is the fact that the person claiming the deduction need *not* show that he in fact owned a "debt" or that such debt had "become worthless during the taxable year"—the requirement for deductibility of both business and nonbusiness bad debts under § 23 (k)(1) and (4)—since "for purposes of this section" (§ 166 (f)) the guarantor's loss is "treated as" a debt "becoming worthless within such taxable year" as the loss occurs. In other words, though assimilated to a "debt" loss, the loss arising from the guaranty payment in fact need have none of the attributes of a debt loss in order to be deductible. The primary thrust of

---

[15] The Senate Report on § 166 (f) simply states: "Your committee also provided that business bad debt treatment will be available where a noncorporate taxpayer, who was the endorser (or guarantor or indemnitor) of the obligation of another, is required to pay the other's debt (and cannot collect it from the debtor). However, this treatment is to be available only where the debt represents money used in the other person's trade or business. Your committee believes that this treatment should be available in such cases since in most cases debts of this type usually are incurred because of business relationships." S. Rep. No. 1622, 83d Cong., 2d Sess. 24–25.

[16] S. Rep. No. 1622, 83d Cong., 2d Sess. 200. (Italics supplied.)

§ 166 (f) was to make deductible some kinds of losses which were theretofore not deductible, and I think that drawing from the language of the Section a definitive characterization of such losses as "debts" involves a misplacing of emphasis.

Of still greater significance is the fact that § 166 (f) losses are deductible *in full*. This, it seems to me, is more consistent with the view that Congress did not intend to disturb the line of cases which, following *Fox,* gave a full deduction under § 23 (e)(2) to losses on guaranties of corporate obligations, than it is with the Court's view that § 166 (f) confirms Congress' intent that such losses should be only *partially* deductible as nonbusiness bad debts under § 23 (k)(4). Otherwise we would have the anomalous result that under the 1954 Code individual guarantors of noncorporate obligations are given better treatment than those guaranteeing corporate obligations, even though the basic limitation which Congress imposed upon the deductibility of § 166 (f) losses, namely, that the proceeds of the guaranteed obligation "were used in the trade or business of the borrower," is always present in the case of a guaranty of a corporate obligation.

In short, I think that when the purposes and provisions of § 166 (f) are taken together, it is quite evident that the section was intended to *complement* the decisions of these four Courts of Appeals,[17] and not to override them.

Finally, the Government suggests that giving guarantors' losses the same capital loss treatment as nonbusiness debt losses would make for a better tax structure, since, it is argued, both kinds of losses are comparable to losses from investments, which receive capital loss treatment under both the 1939 and 1954 Codes.[18] Even if that be so, this would be a matter for Congress. Our duty is to take the statute as we find it. I would reverse.

---

[17] *Ante,* p. 97.

[18] I. R. C., 1939, § 23 (g)(2)–(4); I. R. C., 1954, § 165 (g).