C. Clinton Carpenter and Phyllis S. Carpenter v. Commissioner.
Carpenter v. Commissioner
Docket No. 1539-64.
United States Tax Court
T.C. Memo 1968-157; 1968 Tax Ct. Memo LEXIS 144; 27 T.C.M. (CCH) 768; T.C.M. (RIA) 68157; July 23, 1968. Filed *144 Held, that the petitioner realized long-term capital gain upon the foreclosure sale of stock which he had pledged to secure indebtedness of a corporation owned by him, and that such gain is not offset by any short-term capital loss, since petitioner failed to prove that the debt which he acquired by subrogation was worthless. Richard B. Spindle, III, 18th Floor, Virginia Nat'1 Bank Bldg., Norfolk, Va., for petitioners. E. M. Paturis, for respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined an income tax deficiency of $39,687.41 against the petitioners for the taxable year 1957. The issue for decision is whether the respondent correctly determined that the petitioners derived taxable income as a result of the *145 foreclosure sale of certain stock which they had pledged as collateral for a loan to another corporation owned by the petitioner C. Clinton Carpenter. Findings of Fact Some of the facts have been stipulated and the stipulations are incorporated herein by this reference. The petitioners resided in Virginia Beach, Virginia, at the time the petition was filed. They filed their Federal income tax return for the taxable year 1957 with the district director of internal revenue, Richmond, Virginia. Sometimes hereinafter C. Clinton Carpenter will be referred to as the petitioner. The petitioner has been engaged in the construction business since 1920. Prior to and during the taxable year 1957 he was engaged in the heavy construction business as a sole proprietor, trading under the name of Carpenter Construction Company. He also owned all the outstanding stock of Chesapeake Manor, Inc. (hereinafter referred to as "Manor"), a corporation which since 1951 had been successfully operating a rental housing project which it owned. The petitioner also owned all the outstanding stock of Chesapeake Housing, Inc., (hereinafter referred to as "Housing") a corporation engaged in the business of *146 developing land and building houses for sale. In accordance with a debenture agreement dated August 15, 1953, First Mortgage Corporation (hereinafter referred to as "First Mortgage") sold debentures of Housing in the total amount of $82,500. First Mortgage insisted upon collateral to secure such debentures. Accordingly, on August 15, 1953, the petitioners entered 769 into an agreement with First Mortgage for the benefit of holders of the debentures, in which the petitioners agreed to purchase the debentures at maturity at face amount, plus accrued and unpaid interest, "provided, however, that first parties [the petitioners] may, at their election, cause Chesapeake Housing, Inc., to discharge said debentures according to their tenor in lieu of purchasing" them. By the same agreement the petitioners, as collateral security for performance of the above obligation, delivered to First Mortgage all the common stock of Manor. It was also provided in the agreement that if Housing should not discharge the debentures and the petitioners should not repurchase them, then First Mortgage, at the request of any of the holders of the debentures, could sell such collateral by public sale, free *147 from any right of redemption on the part of the petitioners. The above debentures were subsequently retired and new debentures were issued under agreements substantially identical to the above agreements. On June 3, 1957, the face amount of Housing's outstanding debentures was $159,000. The net proceeds from the sale of all debentures had been delivered by First Mortgage to Housing. By June 3, 1957, Housing was in default on the debentures, and on that date First Mortgage offered the stock of Manor for sale at public auction. At such public auction First Mortgage, as agent for the owners of the debentures, purchased the stock of Manor for $150,000. Thereupon First Mortgage immediately assigned and delivered Housing's debentures in the amount of $159,000 to the petitioner. Thereafter, First Mortgage made no further effort to collect any additional amount from Housing or the petitioner to satisfy claims with respect to the debentures. The petitioner's basis in the Manor stock sold by First Mortgage was $500. At the time of the foreclosure sale the petitioner and his sole proprietorship, Carpenter Construction Company, were indebted to Housing in the total amount of $151,820, *148 which debts were reflected on Housing's books as accounts receivable. The consideration giving rise to the indebtedness has not been shown. Housing's balance sheet at or about the date of foreclosure was as follows: *13 ASSETS
Cash on Hand and In Banks
$ 4,516.85
Accounts Receivable
Carpenter Construction Co
$106,820.31
C. C. Carpenter
45,000.00
Osceola Development Corp. 62,700.00
Total Accounts Receivable
$214,520.31
Land 5,325.00
Total Assets $224,362.16
LIABILITIES
Debenture Bonds Payable
$159,000.00
Capital Stock
10,000.00
Net Worth 55,362.16
Total Liabilities and Net Worth $224,362.16 The petitioner's wife was not liable on any of the debts owing to Housing. On May 31, 1957, the balance sheet of the petitioner's sole proprietorship, Carpenter Construction Company, showed total assets of $268,354.22, total liabilities of $225,431.01, and a resulting net worth of $12,923.21. The petitioner had no assets other than those shown in the balance sheet of Carpenter Construction Company, except his home which was owned by him and his wife jointly. Included in the assets of Carpenter Construction Company at book *149 value where an account receivable from, and a 40 percent stock investment in, Osceola Development Corporation in the respective amounts of $11,285.63 and $45,000, and a stock investment in Housing in the amount of $10,000. Osceola Development Corporation had been formed prior to 1953 for the purpose of acquiring 600 acres of land in Florida and constructing a housing development thereon. In 1953, following the issuance of debentures by Housing, Osceola Development Corporation made preliminary presentations to the Federal Housing Administration which made tentative 770 commitments to Osceola. Osceola proceeded to spend money for development. However, in 1954, FHA refused to give it a formal commitment. Accordingly, Osceola could not obtain the necessary financing for the development as planned, but nevertheless continued the development insofar as it was able to do so. In the notice of deficiency the respondent increased the petitioners' reported income from capital gains by $79,250, stating as follows: It is held that you realized a gain in the amount of $158,500.00 on the sale of capital stock of Chesapeake Manor Corporation on June 3, 1957. The gain has been computed as *150 follows: Consideration received
$159,000.00
Basis of stock surrendered 500.00
Gain realized $158,500.00
Taxable at 50% (long-term) $ 79,250.00 Opinion The respondent contends that the petitioner realized long-term capital gain of $158,500 upon the foreclosure sale of his stock of Manor, this being the difference between the basis of the stock in his hands, $500, and the indebtedness of $159,000 of Housing for which he was liable as guarantor and which was satisfied by the sale. [1] The petitioner now concedes that the foreclosure sale was a sale for purposes of establishing capital gain or loss ( Helvering v. Hammei, 311 U.S. 504) and that he did REALIZE A LONG-TERM CAPITAL GAIN OF $158,500. However, he contends that such gain should be offset by a short-term capital loss of $159,000, and that consequently as a result of the whole transaction he had a short-term capital loss of $500. His position is that upon the discharge of his liability as a guarantor of Housing's liability on the debentures he became the creditor of Housing, by subrogation, in the face amount of the debentures, $159,000 ( Putnam v. United States, 352 U.S. 82) *151 and that such indebtendenss was worthless when he acquired it, resulting in a short-term capital loss. See section 166(d) of the Internal Revenue Code of 1954, which provides that losses from the worthlessness of nonbusiness debts shall be considered short-term capital losses.
In support of his claim that the debentures were worthless when acquired by him at the time of the foreclosure, the petitioner testified that Housing's accounts receivable were uncollectible and that hence it was insolvent. Two of such accounts receivable, in the total amount of $151,820.31, represented amounts which he and his sole proprietorship, Carpenter Construction Company, owed Housing. He stated that he could not pay that amount because his resources, except a home which he and his wife owned jointly, had been drained, principally *152 as a result of failure of Osceola Development Corporation. He stated that the account receivable from, and the stock interest in, Osceola in the respective amounts of $11,285.63 and $45,000, and the stock investment in Housing in the amount of $10,000, carried as assets on the books of his sole proprietorship, were all worthless, with the result that his sole proprietorship (and hence he, himself) had an excess of liabilities over assets of about $55,000. He also claims on brief that the amount of $62,700 carried on the books of Housing as an account receivable from Osceola Development Corporation was worthless. The question of whether a debt is worthless is a question of fact as to which the burden of proof is upon the petitioner. Earl v. Perry, 22 T.C. 968. Upon the record here presented, we cannot find that the petitioner's claim against Housing, represented by the debentures, was worthless. Certainly $151,820.31 of the petitioner's claim could be satisfied by Housing by offsetting the petitioner's debt to it in that amount. In this connection reference is made to section 8-239 of the Code of Virginia, which provides that mutually existing claims and demands may *153 be set off by litigants. See also R. H. Barbour, 29 T.C. 1039, in which it was held that in order to establish his right to a bad debt deduction, a taxpayer must show that there is a net indebtedness due him from the debtor - that is, there must be offset against his claim any claim the debtor has against him. This would leave a net amount owing to petitioner of $7,179.69. To meet this net 771 obligation Housing had the account receivable from Osceola Development Corporation in the amount of $62,700, cash of $4,516.85, and land carried in the balance sheet at a value of $5,325. Since there is no detailed evidence as to the financial condition of Osceola Development Corporation, we cannot conclude that the petitioner has shown that Housing's claim against that company was worthless. But, even if it were worthless, there remained assets of over $9,000 available for payment of petitioner's net claim against Housing in the amount of $7,179.69. In view of the foregoing, we conclude that the petitioner has failed to establish that he sustained any short-term capital loss which may be offset against the longterm capital gain derived by him upon the foreclosure sale of the *154 Manor stock. It should be added that there is no issue before us as to the deductibility of any losses which the petitioner may have sustained upon his investment in, or on account of the debts owed him by, Osceola Development Corporation. Decision will be entered for the respondent. Footnotes
1. Although the stock was sold at public auction for $150,000, it was bought by First Mortgage as representative of the debenture holders and apparently the stock was accepted by the debenture holders in complete satisfaction of the obligation, since no further action was taken to obtain a deficiency judgment against the petitioner or Housing.↩