PETER K. RINGGER AND KATHLEEN RINGGER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ringger v. Commissioner
Docket No. 30367-89
United States Tax Court
T.C. Memo 1991-613; 1991 Tax Ct. Memo LEXIS 660; 62 T.C.M. (CCH) 1436; T.C.M. (RIA) 91613; December 10, 1991, Filed *660 Decision will be entered under Rule 155. Brent R. Armstrong, for the petitioners. S. Mark Barns, for the respondent. KORNER, Judge. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency of $ 12,226.40 in petitioners' 1983 Federal income tax. Following concessions by respondent, [1] the issues for decision are: (1) Whether respondent erred in determining that a partnership in which petitioner husband held a 50-percent interest was not entitled to a business bad debt pursuant to section 166(a); [2] and (2) whether petitioners' payment on a loan guarantee constituted a business or a nonbusiness bad debt. *661 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Peter K. and Kathleen Ringger, husband and wife, resided in Salt Lake City, Utah, at the time of filing their petition. They filed a joint Federal income tax return for taxable year 1983. References to petitioner in the singular are to Peter K. Ringger. Petitioner is a certified public accountant and has held several positions in the field of finance. He was employed by Tracy Collins Bank and Trust Company (Tracy Collins Bank) from 1973 until February of 1983, at which time he went to work for Williamsburg Savings Bank. In addition to his wages as an employee, petitioner reported receiving "other income" on his 1981 through 1983 tax returns in the following amounts: Year
Amount
1981
$ 30,300.00
1982
48,400.00
1983
2,710.50
Petitioner's "other income" was reported as consisting primarily of consulting fees, director's fees, and accounting fees for services rendered to various entities. Through his employment at Tracy Collins Bank, petitioner became acquainted with an attorney named Krege *662 Christensen (Christensen). Although petitioner and Christensen were both employed full-time, they decided they would "like to do a little on the side and make some extra money." At some point in time, they decided to pursue business dealings with a licensed helicopter and fixed-wing aircraft pilot named John Rhodes (Rhodes). On January 6, 1981, John W. Rhodes Enterprises (JWRE) was incorporated. Rhodes assigned his "development of a portable drilling rig and other preliminary business activities related thereto," valued at $ 15,000, in exchange for 15,000 (75 percent) of the issued and outstanding shares of JWRE. The remaining 5,000 shares (25 percent) were acquired for $ 5,000 by petitioner and Christensen, dba New Ventures. New Ventures, which was also formed on January 6, 1981, was an informal partnership that had no written partnership agreement. Petitioner and Christensen each invested $ 3,500 as their capital contributions to New Ventures, and, at all relevant times, each owned a 50-percent interest in the capital, profits, and losses of it. [3]
*663 JWRE was formed as a holding company for three corporations: (1) Intermountain Helicopters (IMH); (2) PDR Manufacturing Corporation (PDRM); and (3) PDR Drilling Corporation dba PDR Exploration (PDRE). [4] At all relevant times, JWRE owned at least 95 percent of the outstanding shares of IMH, at least 80 percent of the outstanding shares of PDRM, and 100 percent of the outstanding shares of PDRE. (IMH, PDRM, and PDRE are sometimes referred to collectively as the "operating companies.") Petitioner was elected treasurer of JWRE and the operating companies, while Rhodes was elected president and Christensen was elected secretary. All three individuals were directors of each of the corporate entities. The operating companies were created to engage in oil and gas exploration in the overthrust belt which runs from Canada to the Gulf of Mexico, with most exploration *664 taking place in the area around Evanston, Wyoming. IMH provided helicopter support for the oil and gas industry doing seismic testing and oil and gas exploration. PDRE managed employees who operated drills and support work for seismic exploration. PDRM was primarily in the business of manufacturing a lightweight portable drilling apparatus used in seismic testing. The opportunity that lead petitioner to become involved with Christensen and Rhodes was based on a light weight oil exploration drill that Rhodes had been developing. The light weight drill that was developed, manufactured, used, and ultimately patented, was known as the PDR-150-D Heliportable Drill Rig. The drill was manufactured at a cost of between $ 25,000 and $ 30,000 and sold for $ 50,000. Use of the PDR-150-D allowed oil and gas exploration companies to reduce their significant helicopter costs to one-tenth that of companies using conventional drills. The PDR-150-D was used by IMH in conjunction with its helicopter leasing activity, and was also sold by PDRM to third parties. In 1981, PDRM could not keep up with demand for the drill. In the early stages of their existence, JWRE and the operating companies *665 were unable to obtain outside financing. During 1981 and 1982, New Ventures made the following advances to or on behalf of JWRE and the operating companies: PAID TO OR ON
DATE
BEHALF OF
AMOUNT
2/23/81
IMH
$ 14,500.00
3/02/81
IMH
5,750.00
3/02/81
JWRE
4,580.00
3/02/81
JWRE
500.00
3/20/81
JWRE
7,500.00
3/27/81
IMH
44,500.00
4/16/81
IMH
1,000.00
4/22/81
PDRM
300.00
4/28/81
PDRM
100.00
4/28/81
IMH
385.58
4/28/81
PDRM
2,048.98
4/28/81
IMH
60.63
4/28/81
PDRM
265.64
4/28/81
PDRM
225.72
4/28/81
IMH
30.94
4/28/81
IMH
1,598.00
5/04/81
IMH
3,500.00
5/13/81
IMH
100.00
5/15/81
PDRM
2,000.00
5/19/81
IMH
100.00
5/21/81
IMH
500.00
6/12/81
PDRM
1,000.00
6/12/81
IMH
500.00
6/12/81
IMH
4,445.38
6/12/81
PDRM
2,591.02
6/18/81
IMH
274.35
7/31/81
PDRM
6,500.00
8/17/81
PDRM
2,000.00
8/21/81
PDRM
3,000.00
9/01/81
PDRM
3,500.00
11/19/81
PDRM
11,000.00
11/20/81
PDRM
25,000.00
11/24/81
IMH
5,000.00
11/30/81
PDRM
4,681.78
10/13/82
PDRM
4,881.28
TOTAL
$ 163,919.30
New Ventures' books carried these advances as accounts receivable for which interest was being charged at the rate of 25 *666 percent. There were no promissory notes which evidenced the advances and the advances were unsecured. New Ventures obtained the capital to make these advances from advances made by petitioner and Christensen in the approximate amounts of $ 22,000 and $ 58,000, respectively, and from unsecured loans they obtained from various banks in Salt Lake City. The loans they obtained had interest rates that varied with respect to the prime rate, but ranged from approximately 17 to 23 percent. New Ventures' records further provided that it received interest and principal payments with regard to these loans in the amounts of $ 10,404.53 and $ 31,827.08, respectively. New Ventures reported interest income of $ 8,069.67 and $ 2,334.86 on its 1981 and 1982 returns, respectively. New Ventures did not make any advances to anyone other than JWRE and the operating companies. On or about February 22, 1982, petitioner, Rhodes, Christensen, and their spouses guaranteed a $ 290,000 loan from Overland Thrift and Loan (Overland) to JWRE and the operating companies. Petitioners, the Rhodes, and the Christensens each put up their homes as collateral for this loan, and were each jointly and severally liable *667 on the loan. New Ventures managed JWRE and the operating companies, while Rhodes provided expertise in daily helicopter operations. From August through December 1981, IMH paid New Ventures $ 3,000 per month, and New Ventures reported the $ 15,000 as management fee income on its 1981 partnership return. In turn, New Ventures disbursed $ 2,000 per month to petitioner and $ 1,000 per month to Christensen from August through December 1981, and claimed a $ 15,000 consulting fee expense on its 1981 return. On its 1982 return, New Ventures reported management fee income from JWRE of $ 9,000 for January, February, and March of that year, and reported management fee expense of $ 9,000 for that year. Petitioner received $ 6,000 of this amount, and Christensen received the other $ 3,000. The amounts petitioner received from New Ventures constituted a portion of the amounts he reported as "other income" from consulting on his 1981 and 1982 returns. In September 1981, New Ventures purchased a small fixed-wing airplane and a training helicopter, both of which were leased to IMH. New Ventures' 1981 and 1982 returns reported lease income from these aircraft of $ 4,500 and $ 9,900, respectively. *668 New Ventures' 1981 through 1983 tax returns listed "Aircraft Leasing" or "Aircraft" as the partnership's principal product or service for each year. In the spring of 1982, oil exploration in the intermountain area suddenly stopped. As a result, JWRE and the operating companies ceased to operate as active businesses by mid-1982. On or about January 17, 1983, petitioners paid Overland $ 65,000 in exchange for being released from further liability on the loan guarantee. On its 1983 return, New Ventures reported a business bad debt of $ 112,092.22, representing the advances it made to JWRE and the operating companies, and passed through one-half of this amount to petitioner as his distributive share. [5] On their 1983 return, petitioners reported an ordinary loss of $ 56,148.66, representing petitioner's distributive share of New Ventures' losses, [6] and a capital loss of $ 65,000, representing the payment they made to Overland. *669 Respondent's notice of deficiency provides: It is determined that you are a 50% partner in the New Ventures Partnership. The Partnership was examined resulting in the partnership loss being adjusted as a result of the full disallowance of the bad debt of $ 112,092.00. Accordingly, your taxable income is increased $ 56,047.00 in 1983.
Petitioners challenged respondent's determination in their petition. In their amended petition, petitioners claimed that their payment on the loan guarantee to Overland was governed by the same principles as the advances made by New Ventures, and that their 1983 return erroneously reported the $ 65,000 payment as a capital loss rather than an ordinary loss. OPINION 1. Advances By New Ventures
The first issue we decide is whether respondent erred in disallowing New Ventures a $ 112,092 bad debt, which resulted in petitioner's being denied his distributive share of one-half of that amount. The parties stipulate that New Ventures made advances to JWRE and the operating companies, and that those advances were worthless in the amounts claimed in 1983. Their disagreement concerns the proper characterization of the losses. Petitioners *670 argue that New Ventures' worthless advances constituted business bad debts, deductible as ordinary losses pursuant to section 166(a). Although respondent's notice does not specifically state the basis upon which he disallowed the bad debt, on brief he limits his argument to a claim that the worthless advances are properly characterized as nonbusiness bad debts, deductible only as short-term capital losses pursuant to section 166(d). [7] Thus, we must determine which subsection of section 166 governs deductibility in the present case. *671 As a general rule, a worthless bad debt may be deducted as an ordinary loss. Sec. 166(a). In the case of taxpayers other than corporations, however, the general rule does not apply if the bad debt is a nonbusiness bad debt. Sec. 166(d)(1). Section 166(d)(2) circuitously defines a nonbusiness bad debt as a debt other than: (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.
Nonbusiness bad debts are deductible as short-term capital losses. Sec. 166(d)(1)(B). Thus, in the case of noncorporate taxpayers, ordinary loss treatment is restricted, by implication, to business bad debts. For petitioners to take a business bad debt deduction, they must establish: (1) That New Ventures was in a trade or business; and (2) that the loans it made were proximately related to that business. Sec. 1.166-5(b), Income Tax Regs.; Putoma Corp. v. Commissioner, 66 T.C. 652, 673 (1976), affd. 601 F.2d 734 (5th Cir. 1979). This determination is essentially one of fact upon which petitioners *672 bear the burden of proof. Rule 142(a); Imel v. Commissioner, 61 T.C. 318, 323 (1973). In their petition, petitioners claimed that New Ventures was formed "to provide financing of various helicopter-related businesses." On brief, however, petitioners state that "Petitioners in this case do not claim to have been in the trade or business of lending money. To the contrary, the Petitioners claim to have loaned money in connection with their trade of leasing aircraft and consulting." [8]
We need not address the issue of whether New Ventures was in a trade or business since petitioners have failed to persuade *673 us that the loans New Ventures made were proximately related to any trade or business in which it may have been involved. Where a person is related to a corporation in both a shareholder and business capacity, the determination must be made as to whether the bad debt at issue was proximately related to the person's trade or business or whether the bad debt was proximately related to the person's investment interest as a shareholder. See United States v. Generes, 405 U.S. 93, 100-103, 31 L. Ed. 2d 62, 92 S. Ct. 827 (1972); Shinefeld v. Commissioner, 65 T.C. 1092, 1096-1099 (1976). Determining whether a bad debt has a proximate relationship to a trade or business entails determining whether the "dominant motivation" for making the loan was to advance or preserve the trade or business. United States v. Generes, supra at 103; Harsha v. United States, 590 F.2d 884, 887 (10th Cir. 1979). In making this finding, our inquiry focuses on the objective facts rather than self-serving statements of subjective intent. Harsha v. United States, supra at 886; Kelson v. United States, 503 F.2d 1291, 1293 (10th Cir. 1974). *674 Petitioners rely primarily on Adelson v. United States, 12 Cl. Ct. 231 (1987), and argue that the objective facts show that New Ventures made the loans in order to advance its consulting and leasing business rather than to protect its minimal investment. New Ventures loaned JWRE and the operating companies in excess of $ 163,000, and New Ventures paid $ 7,000 for its stock in JWRE. In 1981, New Ventures received consulting and leasing income of $ 15,000 and $ 4,500, respectively, and in 1982, it received consulting and leasing income of $ 9,000 and $ 9,900, respectively. Since New Ventures' consulting and leasing income in both 1981 and 1982 exceeded its capital contribution, petitioners argue that "it is reasonable to recognize that New Ventures loaned money to receive immediate returns in the form of consulting and leasing income, rather than to assume that loans were made with the unrealistic hope of receiving a great return on a $ 7,000 stock investment." We disagree. Although the low par value of New Ventures' stock in proportion to the income it received appears to support petitioners' contention, determination of dominant motivation does not depend *675 on a mere "mathematical analysis." Adelson v. United States, 737 F.2d 1569, 1574-1575 (Fed. Cir. 1984). New Ventures' motivation must be determined at the time it made the loans, not at some subsequent point in time. Cf. United States v. Generes, supra; Stoody v. Commissioner, 66 T.C. 710, 718 (1976). At the time when most of the advances were made, New Ventures had not yet purchased the aircraft giving rise to its leasing income, nor was it being paid compensation. These facts contrast with Adelson, where the taxpayer did not hold stock at the time he made the loan in each instance that the Claims Court found that the taxpayer's loan constituted a business bad debt. Adelson v. United States, 12 Cl. Ct. 231 (1987). In essence, petitioners are arguing that New Ventures made the loans primarily in anticipation of receiving future income in the form of consulting fees and lease income. With regard to an allegation that a loan was made to receive future compensation, this Court had stated: a loan motivated by one's status as an employee seems more plausible where its objective is to *676 protect a present salary, rather than promote a future one. Putting funds at risk under such circumstances is more characteristic of the investor. [Putoma Corp. v. Commissioner, supra at 674; Fn. ref. omitted.]
Although New Ventures did receive consulting fees and lease payments, petitioner testified that, in its early stages, New Ventures did not have "in mind" making any specific amount of consulting income, and that it did not decide to lease aircraft until the latter part of 1981. While New Ventures may have been motivated in part to make the loans in order to receive some unknown amount of future income, we are not persuaded that its "dominant" motivation for making the loans was proximately related to any business in which it may have been involved. Rule 142(a). Instead, we believe it made these loans in relation to its status as an investor in what appeared to be a promising corporation. We therefore hold for respondent on this issue, and limit petitioner's deduction to a short-term capital loss pursuant to section 166(d)(1)(B). 2. Petitioners' Loan Guarantee
The second issue for consideration is whether the $ 65,000 paid by petitioners *677 as guarantors on the loan from Overland to JWRE and the operating companies entitled petitioners to a business bad debt deduction under section 166(a)(1). On their 1983 return, petitioners reported this payment as a capital loss. Petitioners now contend that they erred in not reporting the payment as an ordinary loss because they guaranteed the loan to protect petitioner's consulting income rather than as a way to protect his $ 3,500 investment. Respondent contends that petitioners correctly reported the payment as a nonbusiness bad debt under section 166(d). Losses resulting from payments made pursuant to a loan guarantee are normally treated as bad debt losses. Putnam v. Commissioner, 352 U.S. 82, 86, 1 L. Ed. 2d 144, 77 S. Ct. 175 (1956). Petitioner was both a consultant and a shareholder. In order for petitioners to qualify for a business bad debt deduction, they must establish that their dominant motivation for guaranteeing the loan was in furtherance of petitioner's consultant status. United States v. Generes, supra.
We believe that petitioners guaranteed the loan in furtherance of petitioner's shareholder status rather than his consultant status. In this *678 respect, petitioner's investment was more than $ 3,500 since the loans made by New Ventures must also be considered for this purpose. Smith v. Commissioner, 60 T.C. 316, 319 (1973). Additionally, although petitioner was being paid for consulting services in February 1982, at the time petitioners guaranteed the loan, he testified that in April 1982 he attempted to diminish the amount of time he spent consulting because Tracy Collins Bank, his full-time employer, was considering him for a promotion. Further, at this same time petitioner was employed full-time by Tracy Collins Bank, and he was spending more time with and receiving consulting fees in greater amounts from entities other than New Ventures. We think it improbable under these circumstances that petitioners' dominant motivation for guaranteeing this loan was business related. Based on the record before us, we are not persuaded that petitioners' payment on the loan guarantee constituted a business bad debt. Rule 142(a). We hold that petitioners correctly reported this payment on their 1983 return as a short-term capital loss. Due to concessions by respondent, Decision will be entered under Rule *679 155. Footnotes
1. On their 1983 return, petitioners reported the full amount of petitioner husband's pension distribution. In the event that we sustain his notice of deficiency, respondent concedes that petitioners are entitled to elect the special 10-year averaging method for total distribution from a qualified retirement plan. ↩
2. All statutory references are to the Internal Revenue Code as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
3. In November 1981, New Ventures acquired an additional 2,000 shares in JWRE from Rhodes for $ 2,000. At all relevant times thereafter, New Ventures held 35 percent of the issued and outstanding shares of JWRE with the balance of the shares held by Rhodes.↩
4. Both PDRM and PDRE were also incorporated on January 6, 1981, and IMH was incorporated on January 8, 1981. The initials PDR stand for Portable Drilling Rig.↩
5. New Ventures wrote off $ 20,000 as uncollectible in 1982. This $ 20,000 plus the $ 31,827.08 in repaid principal represents the difference between the amount New Ventures advanced and the amount it claimed as a bad debt in 1983. ↩
6. Petitioner's distributive share of New Ventures' losses also included 50 percent of a $ 205.09 guaranteed payment to partners.↩
7. In a footnote to his brief, respondent did cite the factors that a court will normally look at in determining whether advances made by a shareholder to a corporation are loans or whether they are actually contributions to capital. However, respondent only cited those factors as evidence that New Ventures acted in a nonbusinesslike manner. Since respondent did not argue that these advances constituted contributions to capital, we limit our inquiry to the deductibility of these advances pursuant to sec. 166↩.
8. Although New Ventures is not a petitioner in this case, it is clear from their brief that petitioners are not claiming that New Ventures was in a separate trade or business of lending money. We note that the record does not support a finding that either petitioners or New Ventures was in a lending trade or business. See Estate of Bounds v. Commissioner, T.C. Memo 1983-526↩.