Frank Nelson, Jr., and Lee Etta Nelson v. Commissioner.
Nelson v. Commissioner
Docket No. 62593.
United States Tax Court
T.C. Memo 1958-179; 1958 Tax Ct. Memo LEXIS 45; 17 T.C.M. (CCH) 888; T.C.M. (RIA) 58179; September 29, 1958
*45 1. Held: (1) that petitioner's direct advances to Southwest Land Improvement Company, Inc., of which he was sole stockholder, constituted contributions to its capital and became worthless in 1949, and (2) that the payments by petitioner, less the assets received upon dissolution, to third parties on behalf of Southwest constituted guaranty payments and were deductible in 1949 as bad debts under section 23(k), Internal Revenue Code of 1939. Putnam v. Commissioner, 352 U.S. 82 (1956). Held, further, that the bad debts were nonbusiness bad debts under section 23(k)(4) of the 1939 Code. 2. Petitioner was also the sole shareholder of the Frank Nelson Realty Company, Inc., a real estate and insurance company whose largest account was Southwest. Realty, after 5 years of losing operations, was dissolved in 1950. Petitioner, besides his $2,000 original capital contribution, had advanced about $32,000 to Realty by the end of 1950. Held, that the advances to Realty were contributions to capital; held, further, that the original contribution of $2,000 plus the net advances as of December 31, 1949, became worthless in 1949 and the balance became worthless in 1950. Lee C. Bradley, Jr., Esq., *46 Comer Building, Birmingham, Ala., and John N. Wrinkle, Esq., for the petitioners. Frederick T. Carney, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income tax for the years 1949 and 1950 in the amounts of $22,107.30 and $5,286.04, [1] respectively. The deficiency for each year is due to several adjustments only one of which (for each year) is in issue. The adjustment in issue (for each year) is the disallowance of losses in two wholly owned corporations as business bad debts under section 23(k)(1), Internal Revenue Code of 1939, [2] and the determination that those losses represent losses of capital contributions under section 23(g), or, in the alternative, that they represent nonbusiness bad debts under section 23(k)(4). The amounts of the losses are also in issue. Findings of Fact A stipulation of facts has been filed; it is incorporated herein by this reference. Frank Nelson, Jr., hereinafter *47 referred to as petitioner or Nelson, and Lee Etta Nelson are husband and wife residing at Birmingham, Alabama. They filed joint individual Federal income tax returns for the calendar years 1949 and 1950, on the cash basis, with the Collector of Internal Revenue for the District of Alabama. Southwest Land Improvement Company, Inc., hereinafter referred to as Southwest, was incorporated under the laws of the State of Alabama on May 15, 1945. The paid-in capital was $2,000 represented by 200 shares of $100 par value stock. Of these shares, 197 were issued to Nelson. The remaining 3 shares were issued to members of his family but were acquired by Nelson on December 18, 1945. He thereafter remained the owner of the entire 200 shares until the dissolution of Southwest. The Frank Nelson Realty Company, Inc., hereinafter referred to as Realty, was incorporated under the laws of the State of Alabama on February 19, 1946, for the purpose of engaging in the general real estate and insurance business. The authorized capital stock was divided into 200 shares of $10 par value stock. Of these shares, 160 were issued to Nelson. The remaining 40 shares were issued to Robert W. Holmquist, who acted *48 as manager of Realty, and William P. Robertson. They immediately endorsed the 40 shares issued to them and delivered them to Nelson, who thereafter owned all of the stock of Realty. Nelson, his mother Olive L. Nelson, and his sister Margaret Nelson DeBardeleben, hereinafter referred to as Margaret, beneficially owned all of the stock of The Frank Nelson Estate, Inc., hereinafter referred to as Estate. Estate owned all of the stock of both the Frank Nelson Building, Inc., hereinafter referred to as Building and the Nelson Realty Co., Inc., hereinafter referred to as Nelson Realty. Southwest had as its principal purpose the development of a real estate subdivision, Idlewild Hills, consisting of about 100 lots. It sold lots to the public generally and contracted to build houses for war Veterans exclusively, under the benefits of the priority regulations affecting building materials existing in favor of war Veterans at that time. In 1945 or 1946, Southwest started construction of 25 houses in Idlewild Hills. Funds were obtained by a construction loan from Investors Syndicate, hereinafter referred to as Investors, which was secured by a mortgage on the Southwest real estate and which Nelson *49 guaranteed, and by deposits of war Veterans. Nelson also constantly advanced funds to Southwest. His first advance in the amount of $6,000 was made shortly after Southwest was organized. Southwest did not give Nelson any notes evidencing the advances and no provision for interest was made. On its books Southwest recorded these advances from Nelson as accounts payable. Although Southwest held itself out as a corporation Nelson authorized employees of Southwest, in the event of questions over Southwest's credit, to state that Nelson was behind Southwest and would make good any of its obligations. In addition to his endorsement of the Investors note, supra, Nelson acknowledged his liability for Southwest's other debts. *
In the latter part of 1946, Southwest encountered financial difficulties, which were due in part to poor weather which hampered construction work, unexpected rock deposits, and a shortage of materials. From that time on Southwest was never in sound financial condition. On November 8, 1946, Edward Rigel filed a suit against Nelson, Southwest, Investors, Holmquist, *50 and others alleging that he (Riegel) had deposited money with Southwest for the purchase of a lot and the construction of a house thereon and that the deposit had been used in a wrongful manner. He also alleged that he was led to believe that Nelson was doing business as an individual rather than as a corporation and that Southwest was merely Nelson's trade name. He asked, inter alia, that a receiver be appointed to manage Southwest and that a personal decree be entered against Nelson and the other defendants. On November 19, 1946, a petition was filed by a group of Southwest's creditors, praying that proceedings against Southwest be had under Chapter X of the Bankruptcy Act. A special master was appointed and on March 19, 1947, he submitted a report which recommended that the petition be approved. The balance sheet of Southwest at December 31, 1946, showed the following: Assets
Cash
$ 27.82
Accounts Receivable
11,350.50
Houses Unsold
194,925.05
Inventory - bldg. material & sup-
plies
12,911.35
Lots Unsold
83,254.08
Other
6,928.19
$309,396.99
Liabilities
Miscellaneous
$ 7,020.09
Accounts payable
68,628.51
Deposits to be Refunded (Vet-
erans)
95,307.00
Notes Payable
4,000.00
Mortgages Payable - Investors
86,261.50
Reserve for Improvements
35,273.01
Due Stockholders - Paid-
in Surplus (contrib-
uted by Nelson)
$30,053.81
Capital Stock
2,000.00
Surplus 12/31/45
208.71
$32,262.52
Less Deficit - 1946
19,355.64
12,906.88
$309,396.99
*51 About the beginning of 1947, Nelson made certain calculations relative to the subdivision which can be summarized as follows: Cost to complete project
$489,065
Proceeds from sale of 25 houses at
$15,000
375,000
Net cash deficit on operations (offset
by ownership of 50 lots)
$114,065 After making the calculation, Nelson felt that by completing the project there was a chance that he would come out even, but that if he abandoned the project his loss would be greater than that shown in the above calculation. He felt that if he did not lose too much money by going ahead, and by keeping a good reputation for meeting his obligations, he could proceed to build on the remaining lots in Idlewild Hills and start other subdivisions which would be profitable. Nelson decided that about $421,000 would be needed to complete the project. However, as shown by the balance sheet at December 31, 1946, Southwest did not have any substantial liquid resources and its properties were already mortgaged. Nelson did not have any substantial cash resources but he did own a valuable interest in Estate. After considerable efforts to obtain financing for Southwest from various sources Nelson finally induced his mother and *52 sister to allow the real properties owned or controlled by Estate to be mortgaged on behalf of Southwest. On May 14, 1947, a loan in the principal amount of $421,260.73, with interest at the rate of 5 per cent per annum, was secured from Investors. The note was due and payable on demand after May 14, 1948, and prior to May 14, 1949, and without demand on May 14, 1949. Nelson, Southwest, Building, Estate, and Nelson Realty were jointly and severally liable on the note evidencing the loan. The loan was secured by a mortgage on Idlewild Hills, and by junior mortgages on real property owned by Building, Estate, and Nelson Realty. The agreement pursuant to which the loan was made provided that the principal sum shall be advanced by Investors to enable the borrowers to complete the Idlewild Hills project, i.e., to complete the construction of the houses, to pay outstanding bills for labor and material, etc., refund any deposit of earnest money, pay and satisfy the prior mortgages held on 29 lots by Investors, and pay all costs and expenses incident to litigation pending against Southwest. Certain provisions dealt with permanent mortgages on the houses and proceeds from the sale of the houses. *53 Southwest recorded the loan as a mortgage payable to Investors. The proceeds of the loan were applied or disbursed in accordance with the loan agreement and the houses were completed. On November 25, 1947, the petition in bankruptcy against Southwest was dismissed. The houses, however, could not be immediately sold at a price which Nelson regarded as fair. Nelson, despite continued pressure from Investors and his mother and sister, refused to sell them at deflated prices. Southwest did not sell any houses in 1947. Its income tax return for 1947 showed gross profit (from rents) in the amount of $300, expenses of $3,583.41, and a resulting net loss of $3,283.41. The balance sheet of Southwest at December 31, 1947, showed the following: Assets:
Cash
$ 6,758.70
Accounts Receivable
11,050.50
Cost of Lots Unsold
125,157.29
Cost of Houses Unsold
305,756.85
Inventory - Building Material &
Supplies
1,233.60
Other
10,239.13
Total Assets
$460,196.07
Liabilities: Miscellaneous
$ 5,051.99
Reserve for Improvements
35,273.01
Commissions Payable
9,790.00
Mortgages Payable
400,771.33
Due Stockholders - Paid-
in Surplus
$29,740.08
Capital Stock
2,000.00
Surplus, 12/31/45
208.71
$31,948.79
Less: 1946 Deficit to
Surplus
19,355.64
$12,593.15
Less: 1947 Deficit to
Surplus
3,283.41
9,309.74
$460,196.07
*54 In 1948, Investors demanded payment. On May 14, 1948, an agreement was entered into between the parties to the Investors loan whereby Investors agreed [3] to subordinate its mortgage on the real estate of Building to a mortgage to be given by Building to Connecticut General Life Insurance Company, hereinafter referred to as Connecticut. On June 30, 1948, Building obtained a loan in the principal amount of $125,000, bearing interest at the rate of 4 per cent per annum, from Connecticut and secured the same by a mortgage on its real property. The note was due in monthly installments of $882.50 beginning July 10, 1948, and the balance on June 10, 1964. The net proceeds of the loan, in the amount of $122,729.40, were paid by Connecticut to Investors to be applied on the Investors loan. Building paid $2,400.85 as expenses of procuring the loan. Shortly before the loan was obtained Building, on its books, charged $125,130.25 ($122,729.40 plus $2,400.85) to accounts receivable - Southwest. When the loan was procured it credited the Southwest account for the amount charged and charged $125,526.99 to accounts receivable - Nelson. [4] Southwest, on its books, charged $15,680.59 of the $122,729.40 *55 paid to Investors to interest and the balance to the principal of the Investors loan. Southwest originally credited $125,526.99 to accounts payable - Building. However, by journal entry dated October 30, 1948, it (Southwest) transferred the credit to accounts payable - Nelson and explained the entry as follows: "to correct error of June 30, 1948 and transfer indebtedness to Frank Nelson, Jr. instead of Frank Nelson Building, Inc." By a journal entry dated the same day (October 30, 1948) Southwest credited Nelson with sums originally credited to Building for interest payments made by Building to Connecticut. Subsequently, interest paid by Building to Connecticut from October through July 1949 was credited by Southwest to Nelson. The net effect of the above entries concerning the Connecticut loan (and the interest and expense connected therewith) on the books of Building and Southwest was to treat Building as being the *56 debtor of Connecticut, Nelson as being the debtor of Building, and Southwest as being the debtor of Nelson. During 1948, Southwest sold one house and lot at a loss and on its return for 1948 reported a net loss of $39,454.76. On its return it deducted interest in the amount of $30,390.28, which included: Investors (portion of the $122,729.40
proceeds of Connecticut loan paid
to Investors which Southwest
charged to interest)
$15,680.59
Accrued, but unpaid, interest on In-
vestors loan
$11,779.59
Interest accrued on Connecticut loan
which apparently was paid by Build-
ing and which Southwest owed
Nelson and which Nelson in turn
owed Building
2,865.49
$30,325.67 At December 31, 1948, the book cost of the houses was $348,781.66 (some $57,000 had been expended in 1948) and the book cost of the lots was $91,972.90. Investors continued to apply pressure on Nelson to repay the loans. William P. Engel of Engel Realty Co. was prevailied upon to assist Nelson in securing a loan through the Bank for Savings and Trust (hereinafter referred to as the Bank) of Birmingham, Alabama, and the Reconstruction Finance Corporation (hereinafter referred to as R.F.C.). Nelson, Southwest, Building, Estate, and Nelson Realty, *57 by a letter dated May 5, 1949, made an application to Engel for a loan of a sum not less than $300,000 and not more than $325,000. The prospective borrowers agreed to mortgage certain properties and to apply the proceeds of the sale of the Southwest houses and lots to the repayment of the loan. They also agreed that: "9. In addition to the matters and things herein provided for, and conditioned upon your ability to obtain said loan, we shall turn over to you for handling, all of the properties belonging to and owned by the Southwest Land Improvement Company aforedescribed; you are to manage said property, have general charge of the same, and have the right to employ agents to sell the same, or sell the same through your own agency, pay regular agent's commission to yourself or to others for the sale of the same, make whatever repairs that may be necessary, insure said property from time to time, and, in fact, do every, any and all things that you may deem necessary in and about the handling of said property, having for its purpose the sale of the same as expeditiously as possible. "10. In consideration of the services that you are to render in the handling of the property of the Southwest *58 Land Improvement Company in the manner herein described, we are to pay you the sum of Fifteen Thousand Dollars ($15,000.00), which sum will be paid to you in cash upon the closing of the loan herein provided for. "11. We shall have the right to cancel and terminate your handling of said property at any time we wish, but in the event we do so, you shall not be required to refund to us any of the consideration to be paid to you. "12. Your services in and about the handling of the said property of Southwest Land Improvement Company shall continue until all of the same has been sold, or until we have dispensed with your services as in the manner herein provided. "13. The $15,000.00 to be paid to you for supervision of the Southwest Land Improvement Company property shall be exclusive of the payments that might be made to you or other agents for the sale of the property, based upon the regular real estate commission provided for by the Real Estate Board of the City of Birmingham." Southwest did not need to have Engel manage its properties but agreed to the above-quoted conditions in order to obtain the loan. The R.F.C., by a letter dated May 12, 1949, approved the application for a loan *59 in the amount of $325,000 (the outstanding balance never to exceed $300,000) subject, inter alia, to the following conditions: (1) that Engel unconditionally guarantee the last $100,000 of the loan; (2) that $291,000 of the proceeds be used to retire the Investors loan and the remaining $34,000 of the proceeds be used as working capital to rehabilitate the premises (Southwest's houses) for sale; and (3) during the life of the loan no dividends, bonuses, or commissions be paid to the borrower's officers, directors, or shareholders without the prior written consent of the lenders. An amendatory letter of approval dated May 16, 1949, stated that Nelson would not be required to sign the note as a joint maker but that he would be required to sign as an unconditional guarantor. On June 9, 1949, a loan in the amount of $325,000 was secured from the Bank and the R.F.C., the R.F.C. participating to the extent of 60 per cent. The note evidencing the loan (dated May 31, 1949) provided for interest at the rate of 6 per cent per annum on 40 per cent of the principal (Bank's share) and 4 per cent per annum on 60 per cent of the principal (R.F. C.'s share) and was signed by Southwest, Building, Estate, *60 Nelson Realty, and Nelson. Interest payments were to be monthly, commencing 30 days after execution, and principal payments in the amount of $600 were to be monthly, commencing 60 days after date. It was secured by a mortgage on all of the real property of Southwest and by junior mortgages of Building, Estate, and Nelson Realty. Of the net proceeds of the loan in the amount of $297,229.45, $274,458.66 was applied to payment of the remaining principal on indebtedness to Investors; [5] *61 $15,270.79 was paid to Bainbridge & Mims, attorneys, for services performed by them in connection with the securing of the Investors loan in 1947; and the remaining $7,500 was advanced to Southwest. On August 18, 1949, after the balance of the Bank loan had been reduced to some extent, Bank advanced an additional $5,000 on the some note. The $12,500 advanced directly to Southwest was used to place the houses (which had been lying idle for over a year) in salable condition. Nelson paid $631.25 in 1949 for title insurance expense in connection with the Bank loan. On June 9, 1949, concurrently with the execution of the note to Bank, an instrument addressed to Estate, Building, and Nelson Realty was executed by Southwest and Nelson. The instrument stated that Southwest and Nelson, "its [Southwest's] organizer, the equitable owner of all of its stock and guarantor of its obligation" desire to induce the addressees to join in the execution of the note and mortgage to Bank. As an inducement to, and as consideration for, this action Southwest and Nelson stipulated and agreed, inter alia, that: (1) the proceeds of the Bank loan will be used to discharge the indebtedness of Southwest, for which it (Southwest and Nelson) and the addressees are liable, to Investors; (2) Southwest is the primary obligor on the indebtedness to Investors and it (Southwest) shall remain the primary obligor on the Bank loan; (3) the addressees, as between the parties hereto, become liable to Investors and will become liable to *62 Bank only as accommodation to Southwest and Nelson; (4) Nelson, in order to induce the addressees to become liable to Investors and Bank, promised and now promises to unconditionally guarantee that if they are forced to pay any part of either indebtedness he will make them whole and hold them harmless from liability; (5) as between the parties the assets of Southwest and Nelson, in the order named, shall be exhausted before any of the assets of the addressees are subjected to satisfaction of the indebtedness; (6) Nelson, as unconditional guarantor of the primary obligor, Southwest, shall be given no notice or demand of payments required or made by the addressees; (7) the addressees shall not be required to exhaust their remedies against Southwest before calling upon Nelson for satisfaction of the indebtedness; and (8) Nelson, upon demand of any of the addressees or Margaret, which demand shall not be made prior to default of a payment to Bank, shall transfer and assign to Southwest his full legal and equitable title to all stock owned by him in any of the addressees, and further that for purposes of clarification, Margaret now holds the stock of Nelson in Southwest not only for the *63 purpose of securing the indebtedness of Nelson to Margaret but also for the purpose of protecting and securing the addressees. Finally, the instrument recited that any prior agreements are still in full force. Pursuant to an agreement dated August 27, 1949, Building and Nelson Realty were merged into Estate in 1949, and Estate, in consideration of the surrender by Nelson of his stock therein (in Estate) agreed, inter alia: (1) to pay principal, interest and other expenses on the obligation to Connecticut, which were ascertained to total $130,821.04 ($130,024.05 plus $796.99), of which $5,682.94 represented interest accumulated on the $125,000 principal by August 27, 1949; (2) to pay the said $107,106.02 [6] *64 of the principal amount of the said $300,000 debt to the Bank and R.F.C.; (3) to pay a debt of $15,000 owed by Southwest to Engel; and (4) to pay rent to Building owing by Realty. The agreement was executed in strict conformity with the aforesaid June 9, 1949, instrument and operated, ultimately, to discharge all obligations due thereunder by Nelson. Paragraph 3(b)(ii) of the agreement of August 27, 1949, provided as follows: "(ii) The indebtedness shown on said books of account as owing to the Estate Company, to the Building Company, or to the Realty Company by Southwest, and by Tucker & Prince, and by Frank Nelson Realty Company, have been treated as owing by, and have been charged to Mr. Nelson. For purposes of this paragraph (b), the indebtedness of Tucker & Prince and that of Frank Nelson Realty Company includes only the balance on said books of account as of July 31, 1949. Southwest recognizes that it is the principal obligor with respect to the indebtedness so shown as owing by it and by Tucker & Prince, and accordingly promises to pay to Mr. Nelson, on demand, the aggregate amount of the said indebtedness." As of August 31, 1949, Realty owed Building the sum of $4,452 as rent for the office space occupied by Realty since 1947. The amount of such rent owing at July 31, 1949, is not in the record, but the $4,452 was the amount charged to Nelson under the agreement. * The law firm of Tucker & Prince performed services for Nelson and Southwest in connection with the loans from Investors, Connecticut, and Bank. Tucker *65 & Prince owed rent to Building. Building reduced the rent due from Tucker & Prince by $2,308 and charged that amount to Nelson on May 30, 1949. Nelson paid the amount to Building by a charge to his account under Paragraph 3(b)(ii) of the August 27, 1949, agreement. The law firm of Leader, Tenenbaum & Perrine rendered services to Estate, Building, and Nelson Realty in connection with the Bank loan. Building paid that firm $1,020. This amount was charged to Nelson under Paragraph 3(b)(ii) of the August 27, 1949, agreement. The amounts paid by Nelson (charged to him in computing his proceeds on his sale of the stock of Estate) under the August 27, 1949, agreement are as follows: Connecticut loan
$130,821.04 [1]
Bank loan
107,106.02
Management fee to Engel pursuant
to Bank loan agreement
15,000.00
Legal fee to Tucker & Prince
2,308.00
Legal fee to Leader, Tenenbaum &
Perrine
1,020.00
Realty rent to building
$4,452.00 * *66 At the time of the June 9, 1949, and August 27, 1949, agreements there was no reasonable prospect that Southwest would be able to reimburse Nelson, immediately or in the reasonably foreseeable future, for a substantial part of Nelson's advances to or on behalf of Southwest. **
By the end of 1949, all of the assets of Southwest had been disposed of except personal property with a basis of $5,075.64 and lots of real estate with a book value of $60,029.66. At the end of 1949, the books showed that, in addition to the $2,000 paid in by Nelson for capital stock, he had advanced the net amount of $72,600.57 to Southwest, $30,053.81 of which has been stipulated to be a contribution to capital. Included in the $72,600.57 are the $2,308 legal fee to Tucker & Prince and $796.99 of the $130,821.04 representing the Connecticut transactions. *** The books also showed (at the end of 1949) that Southwest owed Realty $26,501.28. The *67 following entries appear on Southwest's books under date of December 28 (presumably 1949): DR.
CR.
Dec. 28
Frank Nelson Realty Company, Inc.
$26,501.28
Frank Nelson, Jr.
$26,501.28
To give effect to the fact that monies advanced by
Frank Nelson Realty Company, Inc. to Southwest Land
Improvement Company were received by the former
from Frank Nelson, Jr. for use in making such ad-
vances, to serve his convenience and that said Frank
Nelson Realty Company, Inc. acted, in effect, as agent
for said Frank Nelson, Jr. to acknowledge Frank
Nelson, Jr.'s actual beneficial ownership of the indebt-
edness from Southwest Land Improvement Company
arising out of the transaction and to give effect to his
obligation to save said Frank Nelson Realty Company,
Inc. harmless with respect thereto.
Dec. 28
Security Savings Bk. - Note Pay
67.12
28
City of Birmingham - Improvement Assmt.
263.12
Frank Nelson, Jr.
330.24
Liabilities assumed.
The record does not show whether the $330.24 transferred by the above entry to accounts payable - Nelson is included in the $72,600.57 which the books showed that Southwest owed Nelson. The profit and loss statement of Southwest for 1949 showed the following: Sales of houses [1] *68 $238,357.93
Cost of houses sold
403,366.46
Loss on houses sold
$165,008.53
Expenses: [2] Attorney fees $ 17,578.79
[3] Interest paid 14,356.42
Repairs and mainte-
nance
7,592.36
Unemployment tax
$ 34.82
Rent and lights
28.93
Telephone and tele-
graph
13.56
Commissions
687.50
Water
28.30
Taxes
274.66
Sundry taxes and
licenses
39.09
Insurance
157.05
Professional services
428.31
General expense
3.63
Mortgage expense
75.95
Machinery & equip-
ment charged off
234.70
Organization expense
charged off
506.31
Insurance - prepaid ac-
count charged off
2,080.86
Mortgage expense de-
ferred charged
[4] off 2,340.82
Electric poles
83.00
Water taps
365.00
Miscellaneous adjust-
ments
.72
Loss on lots trans-
ferred in part pay-
ment of indebted-
[5] ness 35,029.66
81,940.44
$246,948.97
Adjustments
69.24
Loss - 1949
$246,879.73 An agreement regarding the dissolution of Southwest dated December 28, 1949, and signed by Nelson, Holmquist, and John S. Tucker, Jr., provided: (1) that Nelson, Holmquist, and Tucker, constituting all of the shareholders of Southwest, agreed unanimously that Southwest should forthwith dissolve under the provisions of Alabama *69 law; (2) that Nelson, Holmquist, and Tucker agree that Nelson is a creditor of Southwest and the beneficial owner of all of its stock and is entitled to all of the property of Southwest subject to the payment of debts, including his own; (3) that in order to induce Holmquist and Tucker to sign this instrument, Nelson agrees to execute all instruments which may be required to conform to contracts made by Southwest prior to dissolution and to execute any other instruments needed to conform to obligations imposed by the August 27, 1949, agreement or any other agreements; (4) that the only creditors of Southwest are Bank, Nelson, Holmquist, and Realty; that the indebtedness to Bank is to be discharged by Estate in consideration of payments by Nelson but Southwest is not relieved of its obligation to Nelson; that Nelson agrees to pay Holmquist's indebtedness; that Nelson agrees to pay the Realty indebtedness; that Nelson agrees to hold Holmquist and Tucker harmless for any of Southwest's debts they may be required to pay; and further that Nelson represents that he is a creditor of Realty in an amount in excess of the indebtedness of Southwest to Realty and that he supplied Realty with the *70 funds which the books of account show that Southwest owes Realty; that in reality Realty acted as Nelson's agent; that Nelson will cause Realty to credit Southwest for the amount owed and that Southwest will then be indebted to Nelson for a like amount. Southwest was dissolved on December 28, 1949. Upon dissolution Nelson received the remaining assets consisting of real estate (lots) with a book value of $60,029.66, [7] *71 and personal property with a book value of $5,075.64. The personal property consisted of utility deposits in the amount of about $4,300, mortgages and notes receivable *, and a small amount of cash. Nelson personally collected about $3,500 in utility deposits. The utility companies informed him that the $3,500 would be the extent of his refund. The fair market value of the deposits received by Nelson upon the dissolution of Southwest was $4,300. As stated previously, Realty was formed for the purpose of engaging in the general real estate and insurance business. Nelson contemplated that it would sell the properties developed by Southwest and also engage in the general building business. A major portion of the business transactions of Realty consisted of its participation in the sale of lots and houses and insurance thereon for Southwest. Holmquist was in general charge of the Realty operations. Nelson authorized Holmquist to pledge his (Nelson's) credit if any question arose over the credit standing of Realty. Realty, whose financial success was dependent to a great extent on Southwest's financial success, was not in sound financial condition after the latter part of 1946, when Southwest encountered financial difficulties. By the end of 1946, Southwest owed Realty $12,064.86, which amount included $10,000 for selling commissions and $1,387.06 for insurance premiums. While Southwest was having financial difficulties in 1946-1948 and because of its involvement in the bankruptcy proceedings, it ceased some of *72 its activities. Nelson advanced certain funds to Realty, which Realty expended on the Idlewild Hills project of Southwest. Realty recorded these amounts by crediting accounts payable - Nelson and debiting accounts receivable - Southwest. Southwest recorded the amounts as accounts payable - Realty. As of December 31, 1949, the books of Realty showed that Southwest owed it $26,501.28 and $672.07. Realty's books also showed a liability to Nelson in excess of these amounts due from Southwest. Under date of December 31, 1949, Realty made the following entries on its books: DR.
CR.
Dec. 31
Frank Nelson, Jr.
$26,501.28
Southwest Land Improvement Company
$26,501.28
To transfer receivable from S.W.L. to Frank Nel-
son, Jr.
Dec. 31
Frank Nelson, Jr.
672.07
Southwest Land Improvement Company
672.07
To clear out Southwest Land Improvement Company
account and transfer charge to Frank Nelson, Jr. The balance sheet of Realty at December 31 of the following years is as follows: ASSETS
1946
1947
1948
1949
1950
Cash in Bank
$ 5.95
($ 394.94)
$ 14.63
$ 362.32
Accts. Rec. Ins.
37.50
603.35
Furniture & Fixtures
199.24
199.24
199.24
571.33
Organization Expenses
106.23
106.23
106.23
106.23
Southwest Land Imp. Co.
10,699.58
11,624.63
21,936.12
Southwest Ins. Acct.
1,387.06
Temporary Assets
291.21
20.00
Employees Accts.
110.80
1,540.46
$12,726.77
$11,645.96
$23,796.68
$ 1,663.23
0
LIABILITIES
Frank Nelson, Jr.
$ 1,885.00
$ 8,254.64
$22,623.23
$ 5,853.10
$29,992.03
Withholding Tax
116.90
136.80
Social Security Tax
103.46
234.38
147.48
Commissions Payable
8,894.47
7,217.34
2,681.89
Earnest Money
3,500.00
2,826.53
Unearned Premiums
506.66
Accts. Payable
500.00
4,089.21
5,794.75
Frank Nelson Bldg. Inc.
Rent
3,534.00
4,914.00
Capital Stock
2,000.00
2,000.00
2,000.00
2,000.00
2,000.00
Surplus (Deficit)
(773.06)
(9,560.40)
(11,638.31)
(20,009.43)
(31,992.03)
$12,726.77
$11,645.96
$23,796.68
$ 1,663.23
0
Realty *73 showed losses on operations as follows: Year
Loss
1946
$ 773.06
1947
8,787.34
1948
(Not Shown)
1949
6,260.71
1950
11,982.60
Realty was dissolved on December 28, 1950. From the date of its incorporation through December 28, 1950, it showed an operating loss of $32,252.31. [8]
During the period 1946-1949, nelson devoted all of his time to the affairs of Southwest, Realty, Estate, Building, and Nelson Realty. He served as president of all these corporations and received salaries from some of them. In a letter dated May 13, 1955, to the Internal Revenue Service, Birmingham, Alabama, in connection with his 1949 and 1950 income taxes, Nelson stated, inter alia, as follows: "In the early part of 1949, Investors Syndicate was threatening to foreclose all the mortgages given to it by Southwest Land Improvement Company, and by Frank Nelson Building, Inc., Frank Nelson Estate, Inc., and Nelson Realty Company, Inc. (hereinafter referred to as the 'three companies'). *74 In order to forestall foreclosure by Investors Syndicate and the substantial loss which is necessarily incurred thereon, a loan was obtained from the Bank for Savings & Trusts. Reconstruction Finance Corporation took a sixty per cent (60%) deferred participation therein. The terms of the loan were set forth in detail in a letter dated May 5, 1949, and addressed to William P. Engel by Frank Nelson, Jr., Southwest Land Improvement Company and the three companies. * * * "When Southwest Land Improvement Company first began its operations, it obtained a number of construction loans from Investors Syndicate. They were secured by a mortgage on all of Southwest's properties. I signed each of the notes and thus became guarantor of the obligations. Later on, the construction loans were consolidated into a $421,000 loan which was secured by mortgages on all the properties of Southwest and the three companies. I also signed that note. Southwest would have been unable to obtain the $421,000 loan from Investors Syndicate on the security of its properties even with my personal endorsement. "There was always a definite and specific understanding that Southwest was the principal debtor and that I was *75 the first surety against whom recourse might be had in the event Southwest could not meet its obligations. This was not put into writing until the execution of the letter agreement dated June 9, 1949, written by me and Southwest to the three companies. While the oral understanding between my mother, my sister and me was probably not phrased in as technical terms as those of the letter agreement, we were being consistently advised by counsel and there was never any doubt but that I was to be the principal surety for the obligations of Southwest. Possibly my obligations would have to be determined under the general law relating to suretyships rather than the terms of the oral agreement. I have been informed by counsel that an agreement between sureties relating to contribution need not be in writing. * * * "Although I cannot be certain of the price which would have been paid at a foreclosure sale, it is my opinion that Southwest would have received a credit of approximately $100,000 on the Investors Syndicate's indebtedness, if there had been a foreclosure. In the final analysis, Southwest realized approximately $190,000, net, on sales of improved property made by it, and, on liquidation *76 of Southwest, the Revenue Agent's report assigned the value of $43,000 to the properties which were transferred to me. Thus, Southwest and I ultimately received approximately $233,000 in cash and property values instead of the $100,000 which might have been realized on a foreclosure sale. It is obvious that one object of the loan was to reduce anticipated losses." Nelson, on his return for 1949, reported on Schedule D long-term capital gains and losses (no short-term transactions were reported) as follows: Stock of Estate
Sales price
$729,423.34
Less basis
330,542.82
Gain
$398,880.52
Less - Stock of Southwest
2,000.00
Net Gain (one-half to gross income)
$396,880.52
Nelson, on his 1949 return, claimed an ordinary deduction for a bad debt in the amount of $306,486.52 on the Southwest venture computed as follows: Bad Debt - Southwest Land Improve-
ment Company
Loans - total
$336,562.16
Received
Lots - which cost
$60,029.66 - Value
$25,000.00
Other Assets - at book
value (which is prob-
ably an overstatement
of value)
5,075.64
30,075.64
Balance - Uncollectible
$306,486.52
The respondent reduced the capital gain realized by petitioner on the disposition of the stock of Estate from $398,880.52 to $329,718.83. (Petitioner *77 does not object to that adjustment.) Respondent disallowed the bad debt deduction of $306,486.52. He computed Nelson's loss on the Southwest venture as follows: [9]
The respondent treated the loss as a capital loss and computed the petitioner's capital gains as follows: Long-term capital gain on sale of
stock of Frank Nelson Estate,
Inc., Exhibit B
$329,718.83
Long-term capital loss on stock of
Southwest Land Improvement
Company, Inc., Exhibit A
283,605.00
Net long-term capital gain
$ 46,113.83 The respondent explained his treatment of the loss on the Southwest venture as follows: "(b) *78 It is determined that the deduction claimed by you in your return for the taxable year ended December 31, 1949 in the amount of $306,486.52 and described therein as a bad debt due from Southwest Land Improvement Company, Inc., is not an allowable deduction under provisions of the Internal Revenue Code of 1939. "It is further determined that advances by you to Southwest Land Improvement Company, Inc., and amounts paid by you and designated for the account of that corporation, as shown by Exhibit A, constituted contributions to the capital of Southwest Land Improvement Company, Inc., and failure to recover such amounts resulted in capital losses, deductible only to the extent provided in sections 117(b) and (d) and 23(g) of the Internal Revenue Code of 1939; in the alternative, if it is finally determined that failure to recover advances made by you to Southwest Land Improvement Company, Inc., and amounts paid by you and designated for the account of that corporation resulted in bad debts, then it is held that such bad debts were nonbusiness bad debts under section 23(k) (4) of the Internal Revenue Code of 1939, limited in deductibility to the extent provided in sections 117(d) and 23(g) of the Internal Revenue Code of 1939." *79 Nelson, on his 1950 return, claimed an ordinary deduction for a bad debt in the amount of $46,035.11. A schedule attached to the return explaining the "bad debt" showed the following: Payments for Frank Nelson Realty Co. [list of 25 items with payees
and dates ranging from 6/16/50 to 11/20/50]
$16,043.08
Advances to Frank Nelson Realty Co. - prior to its dissolution
Per Balance Sheet supplied by Gilmer
$29,992.03
Assets
Liabilities
Frank Nelson, Jr.
$29,992.03
Capital
Capital Stock
$ 2,000.00
Deficit
(31,992.03)
(29,992.03)
29,992.03
Total
$46,035.11
property at $25,000 while re-
spondent valued it at $38,050.)
$ 13,050.00
Amount shown on Southwest's
books as owing to Realty, which
was transferred by Southwest's
entry dated December 28, 1949,
to accounts payable - Nelson
26,501.28
Amounts shown on Southwest's
books as owing to third par-
ties, which were transferred by
Southwest's entry dated Decem-
ber 28, 1949, to accounts pay-
able - Nelson
$ 330.24
$ 39,881.52
Respondent increased claimed loss
as follows: Amount due to Engel by South-
west
15,000.00
Difference in amount claimed per
return and amount allowed per
deficiency notice
$ 24,881.52
Basis: Original investment
$ 2,000.00
Mortgage - Connecticut General
Life Insurance Company, plus
accrued interest
130,024.05
Net advances by Frank Nelson
72,600.57
Mortgage - Bank for Savings
107,106.02
Debt due William P. Engel as-
sumed by Frank Nelson Es-
tate, Inc.
15,000.00
Total
$326,730.64
Less: Assets received from South-
west Land Improvement Com-
pany, Inc.: Lots sold in 1950
$22,300.00
Lots sold in 1951
5,750.00
Estimated value -
Remaining lots
10,000.00
Other assets
5,075.64
$ 43,125.64
Long-term capital loss
$283,605.00
*80 The respondent, in his notice of deficiency, disallowed the deduction of the above-mentioned bad debt. He adjusted the amount claimed as follows: Losses claimed on advances to
Frank Nelson Realty Com-
pany, Inc.
$46,035.11
Less: Duplicate deductions
13,782.80
Corrected loss
$32,252.31 He explained the disallowance in terms similar to the explanation given respecting the disallowance of the business bad debt claim for 1949. (The petitioner concedes the correctness of the adjustment in amount.) Opinion BLACK, Judge: The petitioner was the sole owner of the stock of both Southwest and Realty. On his 1949 return he claimed an ordinary deduction for business bad debts due from Southwest in the amount of $306,486.52 and a capital loss for worthless stock of Southwest in the amount of $2,000. On his 1950 return he claimed an ordinary deduction for business bad debts due from Realty in the amount of $46,035.11. The respondent disallowed the ordinary deductions for bad debts in both 1949 and 1950 and determined the petitioner suffered capital losses from worthless stock (capital contributions) in the amounts of $283,605 for 1949 and $32,252.31 for 1950. In the alternative, the respondent determined *81 that if the losses are not from worthless stock they are nonbusiness bad debts. The issues involved require a determination of the amount and the nature of certain advances made directly and indirectly to Southwest and Realty by the petitioner directly or by third parties on the strength of his (petitioner's) guaranty. Because of the complexity of the factual situation, we will first summarize the pertinent facts and then discuss what we believe to be the several items comprising the petitioner's losses and the nature thereof for each of the years involved. Summary of Facts Southwest, with paid-in capital of $2,000, was formed in 1945 to develop a 100-lot subdivision which it owned. Realty, also with $2,000 paid-in capital, was formed in 1946 to engage in the general real estate and insurance business and it was contemplated that the Southwest account would represent a major portion of its business. Shortly after it was formed, Southwest began construction of 25 houses which were financed by a construction loan from Investors, secured by a mortgage on the lots and by Nelson's guaranty, and by deposits of purchasers. In addition, Nelson continually advanced funds to Southwest and allowed *82 its and Realty's employees to pledge his personal credit in the event of any question over the credit of either corporation. In the latter part of 1946, after construction of the 25 houses was substantially under way, Southwest encountered financial difficulties which were due in part to unexpected construction problems and weather conditions. A group of creditors filed a petition in bankruptcy against Southwest. Southwest did not have the resources to complete construction or to pay the creditors. Petitioner carefully studied the situation and determined that if the project were abandoned his loss would be greater than if he secured a loan and completed the project. In the latter case he felt that he might break even and could maintain a credit reputation and, therefore, could build on other lots and develop other subdivisions at a profit. He did not have any substantial cash resources but did own a valuable stock interest in Estate, which, inter alia, owned valuable real estate and, in addition, owned all of the stock of Building and Nelson Realty, both of which had valuable real estate holdings. He finally induced his mother and sister, who owned the balance of the stock interests *83 in Estate, to allow the properties of Estate and its subsidiaries to be mortgaged on behalf of Southwest. In May 1947, a loan of about $421,000 was procured from Investors. It was secured by a mortgage on the Southwest property and by junior mortgages on the property of Estate, Building, and Nelson Realty. The note was signed jointly and severally by Nelson, Southwest, Estate, Building, and Nelson Realty and was due and payable on demand after May 19, 1948, and prior to May 19, 1949. Southwest treated the loan as a mortgage payable to Investors. The proceeds were used to pay the construction loan, to refund deposits, to pay creditors, and to complete the 25 houses. The bankruptcy petition was dismissed and the houses were completed. However, they could not be sold for a price that Nelson regarded as fair. In May 1948, Investors sought repayment. Southwest, not having sold the houses, did not have the funds with which to respond. Building obtained a loan of $125,000 from Connecticut, the proceeds of which were paid to Investors to apply on the $421,000 loan. Building treated Nelson as being its debtor for the amount of the Connecticut loan and Southwest, because of the partial payment *84 reduced the amount (both principal and interest) which it owed Investors and treated Nelson as its creditor for that amount. Investors and Nelson's mother and sister continued to apply pressure on Nelson to have the houses sold and the loan repaid but only one house and lot was sold in 1948. With the Investors loan becoming due on May 19, 1949, Nelson sought other means of financing for Southwest. He and the other obligors of the Investors loan applied to Engel, who was in the real estate business, for a loan of from $300,000 to $325,000 to pay off Investors and use a small portion of the proceeds to rehabilitate the houses for sale since they had been lying idle since completion in 1947. If Engel could obtain the loan they agreed to pay him $15,000 to manage the properties, which amount was in addition to any broker's commission he might earn on the sale of the houses and lots. It was contemplated that the houses and lots would be sold and the loan paid off in a short time. Engel arranged a loan with Bank and the R.F.C. in June 1949. The loan was secured by a mortgage on the real property of Southwest and by junior mortgages on the real property of Estate, Building, and Nelson Realty. *85 The note was signed by Southwest, Estate, Building, Nelson Realty, and Nelson. Nelson was an unconditional guarantor and Engel guaranteed the last $100,000 of the loan. The proceeds were used to pay the balance of the Investors loan, some attorneys' fees incurred in connection with the obtaining of the Investors loan, and for rehabilitating the houses for sale. Concurrently with the obtaining of the Bank loan, Southwest and Nelson executed an instrument addressed to Estate, Building, and Nelson Realty which reduced to writing the existing relationship between the parties. The instrument provided that Estate, Building, and Nelson Realty merely acted as accommodation endorsers for Southwest and Nelson; that Southwest was the primary obligor; and that Nelson was the unconditional guarantor of Southwest's obligations. The houses and some of the lots were sold and the proceeds applied to the Bank loan. Nelson, responding as unconditional guarantor of Southwest's obligations, entered into an agreement dated August 27, 1949. Under the agreement Building and Nelson Realty were merged into Estate, and Estate, in consideration of Nelson's surrendering his stock in Estate, agreed, inter alia, *86 ( 1) to pay the principal, interest, and expenses on the Connecticut loan which aggregated $130,821.04; (2) to pay the balance of $107,106.02 on the Bank loan; (3) to pay $15,000 owed to Engel by Southwest; (4) to pay the rent owed to Building by Realty; and (5) to pay the other amount owing by Southwest and Realty to Estate, Building, and Nelson Realty. Southwest was dissolved at the end of 1949 and its remaining assets, real property (lots) with a book value of $60,029.66 and personal property with a book value of $5,075.64, were received by Nelson. At the time of dissolution, Southwest's books showed that Nelson had advanced $72,600.57 to it, for which he did not receive notes, securities, or any evidence of indebtedness. The books also showed that Southwest owed Realty $26,501.28. Realty, which relied heavily on the Southwest account, never operated at a profit. At the end of 1946, Southwest owed it about $12,000 for commissions and insurance premiums. When the bankruptcy petition was pending against Southwest, Nelson would advance funds to Realty which Realty would expend on the Southwest project. Realty treated Nelson as its creditor and Southwest as its debtor and Southwest *87 treated Realty as its creditor. At the end of 1949, in conjunction with the entries made on Southwest's books, Realty debited Nelson with the amounts ($26,501.28 plus $672.09) that its books showed that Southwest owed it (Realty) and credited Southwest with the same amounts. Realty was dissolved at the end of 1950 and the only account left on its books was an account payable to Nelson in the amount of $29,992.03. As far as Nelson's losses in the Southwest venture are concerned, two events in 1949 are significant. They are: (1) The agreement of August 27, 1949, whereby Nelson surrendered his stock in Estate and in consideration therefor Estate agreed to pay certain liabilities of Southwest [10] *88 and (2) the dissolution of Southwest at the end of 1949. Payments under the August 27, 1949, Agreement Under the August 27, 1949, agreement Nelson, as the unconditional guarantor of Southwest's obligations, paid $130,821.04, $107,106.02, $15,000, and certain other smaller amounts. The $130.821.04 represented the amount which Building borrowed from Connecticut plus the interest and expenses connected therewith, [11] *89 all of which was charged to Nelson on Building's books. Building, as an obligor of the $421,000 Investors loan, obtained the Connecticut loan in 1948 and had used the proceeds to pay Investors, in response to Investors demand for payment. The written instrument of June 1949 which spelled out the previous unwritten agreement between Estate, Building, Nelson Realty, Southwest, and Nelson, inter se, stated that Building was a mere accommodation on the Investors loan for Southwest and Nelson and that Nelson was the unconditional guarantor of Southwest, the primary obligor. Therefore, when Building paid Investors it had a right of reimbursement from either Southwest or Nelson for the amount which it paid plus any reasonable expenses connected with making the payment. When Southwest could not reimburse Building, Nelson paid Building. Nelson, of course, then had a right of reimbursement against Southwest. Under these circumstances Nelson's loss arising from the fact that Southwest could not reimburse him is a bad debt loss. *90 Putnam v. Commissioner, 352 U.S. 82 (1956). The fact that part of the $130,821.04 represented interest paid by Building on the loan does not require a different holding as to that part. The principal obligor is required to reimburse the guarantor for the amounts paid by the guarantor, including principal, interest, and expenses. [12] When the principal is unable to reimburse the guarantor the guarantor holds a worthless debt even though some portion of the amount he paid was for interest. In Putnam v. Commissioner, supra, the facts were identical. The guarantor had paid $9,005.21, representing principal of $8,500 and interest of $505.21. The Court treated the entire amount as a bad debt when the principal obligor was unable to reimburse the guarantor. [13] We do also. This holding disposes of the Commissioner's determination that the $130,821.04 represents a contribution to capital and *91 the petitioner's contention that if it does represent a contribution to capital it logically follows that he borrowed the money originally and then contributed it to Southwest's capital and, therefore, he is entitled to deductions for all interest and expenses connected therewith. Neither the Commissioner's determination nor the petitioner's contention comports with the facts as we see them. In order to accept the Commissioner's view, we would not have to find that petitioner borrowed the money from Investors and then advanced it to Southwest as petitioner contends. But it seems that we would have to find that when Nelson guaranteed the Investors loan he did not expect reimbursement from Southwest in the event he was required to respond on his guaranty. Hoyt v. Commissioner, 145 Fed. (2d) 634 (C.A. 2, 1944). Cf. W. F. Young, Inc. v. Commissioner, 120 Fed. (2d) 159, 165 (C.A. 1, 1941). We can make no such finding in view of the fact that Nelson, if he expected any loss at all, anticipated that it would be offset by the undeveloped lots remaining in Southwest's hands. The next amount paid by Nelson under the August 27, 1949, agreement was $107,106.02. This represented the principal *92 remaining on the Bank loan after the proceeds of the sale of the houses and lots had been applied to it. This payment by Nelson must also be regarded as a guarantor's payment which gave rise to a right of reimbursement from Southwest. Putnam v. Commissioner, supra. Of course, it might be argued that in 1949 when he signed the Bank note as unconditional guarantor he knew that Southwest would incur a substantial loss and that if he was forced to respond on his guaranty he would not be reimbursed in full by Southwest. We think, however, that the Bank loan must be regarded as the refinancing of the debt created by the Investors loan and that his intent should relate back to 1947 when he guaranteed the Investors loan. The third amount paid by Nelson under the August 27, 1949, agreement was $15,000 which represents Engel's fee due him pursuant to the loan application of May 5, 1949, made by Southwest, Nelson, Estate, Building, and Nelson Realty. The loan application provided that, if Engel obtained the loan, all of the properties of Southwest would be turned over to Engel for handling, management, and sale and that $15,000 would be paid Engel in consideration for such services. This amount *93 was exclusive of any commission earned by Engel on the sale of the properties. The loan could not have been secured without the agreement to pay Engel the $15,000. Southwest did not need to have Engel manage its properties but agreed to that condition in order to obtain the loan. Regardless of whether the fee is considered to be a fee for obtaining the loan or a fee for management services, we think it was an expense of Southwest since either or both services were for the benefit of Southwest. Being Southwest's expense it would be deductible by it. Nelson, by signing the application, became liable to Engel and under the June 9 instrument executed by Southwest and Nelson, Nelson's status was that of unconditional guarantor of Southwest's liabilities, including the liability to Engel. In these circumstances, we think the amount must be treated in the same manner as the other guaranty payments of Nelson which were discussed previously. Putnam v. Commissioner, supra. There appear to be two other items which Nelson paid as Southwest's guarantor under the August 27, 1949, agreement. One was a legal fee of $2,308 which Building paid to Tucker & Prince (by reducing the rent due from Tucker *94 & Prince to Building) for services performed by Tucker & Prince for Nelson and Southwest in connection with the Investors, Connecticut, and Bank loans. The other was a legal fee of $1,020 which Building paid to Leader, Tenenbaum & Perrine for services performed for Estate, Building, and Nelson Realty in connection with the Bank loan. Investors, Building, and Nelson Realty were acting as mere accommodation for Nelson and Southwest and Nelson was only a guarantor for Southwest, the principal obligor. Southwest was the party which benefited from the loans and it, of course, was required to reimburse Building, which originally paid both fees. Since Nelson, as guarantor, reimbursed Building, Southwest would be obligated to reimburse Nelson. This fact was, of course, recognized by Southwest as to the $2,308 when it deducted this amount on its 1949 return as legal expenses. Although the record is not clear, Southwest, when it recorded the legal fees as expenses, must have credited accounts payable - Nelson with the $2,308. We, therefore, assume that the amount of $2,308 is included in the $72,600.57 (which will be discussed hereafter) which Southwest's books showed that it owed Nelson at *95 December 31, 1949. The $1,020 does not appear to have been recorded on Southwest's books. However, regardless of how these amounts were treated on Southwest's books, we think that being guaranty payments they should be accorded the same treatment as the other items previously discussed. To summarize, under the August 27, 1949, agreement Nelson, as the unconditional guarantor of Southwest's obligations, paid the following: $130,821.04
107,106.02
15,000.00
2,308.00
1,020.00
Total
$256,255.06
Nelson's payment of this amount gave rise to a debt running from Southwest to him, by way of subrogation. Putnam v. Commissioner, supra. There is no question but that the debt became bad in 1949 but, since he received the remaining property of Southwest upon dissolution, the question of the amount of the debt which became worthless remains. There is also the question of whether the debt which became worthless was a business or nonbusiness bad debt. But before taking up these questions, we will discuss the other advances directly or indirectly to Southwest by Nelson. Other Advances to Southwest Direct Advances to Southwest by Nelson. As stated previously, the authorized paidin capital of Southwest was *96 $2,000. This amount, of course, was patently inadequate to finance the operation of Southwest. The operation was financed by a construction loan from Investors, which was secured by a mortgage on the Southwest properties and guaranteed by Nelson, and by deposits of purchasers. In addition, Nelson continually advanced funds to Southwest. His first advance was in the amount of $6,000 and was made a few days after Southwest was organized. By the end of 1947 such advances totaled $30,053.81. These amounts were treated as accounts payable - Nelson on the books of Southwest. There were no notes or other evidence of indebtedness representing the advances and no security was given therefor. At the end of 1949, when Southwest was dissolved, the balance account payable - Nelson account was $72,600.57. The respondent treated the entire $72,600.57 as a capital contribution. Petitioner concedes that the amount advanced as of December 31, 1946, viz, $30,053.81, [14] constitutes a contribution to capital. And from the evidence in the record, we must hold that the entire $72,600.57, less the [amounts] of $2,308 and $796.99 * previously discussed and held to be a debt and included in the $72,600.57 ** *97 represents a contribution to capital. We reach this conclusion after considering the many factors which are relevant in the determination of this question. Of these factors, the only one tending to support a finding of debt is the manner in which the advances were treated on the books, i.e., as accounts payable. On the other hand, the advances were shown on the balance sheets as paid-in capital. [15] The $2,000 original paid-in capital *98 was not adequate to conduct the business of Southwest. The advances were not represented by any notes or other evidences of indebtedness. There was no provision for interest nor were the advances secured. In short, none of the normal creditor precautions were taken by the petitioner in making these advances. Under these circumstances, we cannot say that at the time these advances were made there was a reasonable expectation of repayment. It seems to us that these amounts were intended to be placed at the risk of the business. Further, these advances were not treated by Southwest on a parity with the debts of disinterested third parties but were completely subordinated. In these circumstances, we are unable to find that when Nelson advanced these funds to Southwest there was an intention to create a debt. We hold that these advances were *99 contributions to Southwest's capital. See Sam Schnitzer, 13 T.C. 43, affd. 183 Fed. (2d) 70, certiorari denied 340 U.S. 911, where we said: "Bookkeeping, form, and the parties' expressions of intent or character, the expectation of repayment, the relation of advances to stockholdings, and the adequacy of the corporate capital previously invested are among circumstances properly to be considered, for the parties' formal designations of the advances are not conclusive, * * * but must yield to 'facts which even indirectly may give rise to inferences contradicting' them. * * *" See also Mattiessen v. Commissioner, 194 Fed. (2d) 659, affirming 16 T.C. 781. Amounts due Realty by Southwest. At the end of 1949, Southwest owed Realty $27,173.35 ($26,501.28 plus $672.07). [16] Nelson's advances to Realty exceeded that amount. At Nelson's direction, book entries were made as follows: (1) On Realty's books - Realty charged the Southwest account receivable against the account payable to Nelson and (2) on Southwest's books - Southwest charged the Realty account payable and credited Nelson - account payable for the same amount. The effect of the entries is to treat Nelson as paying Realty on *100 behalf of Southwest and to treat Southwest as being the debtor of Nelson for the amount paid. Respondent has refused to recognize these entries and contends that Southwest owed Nelson no such amount at the end of 1949. [17] We think this refusal is erroneous. It is clear that Southwest owed Realty the $27,173.35. The record shows that the amount due Realty included amounts due for commissions, insurance premiums, and expenditures by Realty on Southwest's behalf. Although Nelson did not specifically guarantee Southwest's debts to Realty, his general guaranty certainly covered the debt in question. It is true that Nelson controlled both Southwest and Realty and could have refrained from having the book entries made. But, as we see it, the basis of Southwest's debt to Nelson does not come about merely by virtue of book *101 entries but by virtue of the fact that Southwest actually owed Realty the money and because Nelson was the guarantor of Southwest's debts. To summarize again, at the end of 1949 when Southwest was dissolved, the status of the accounts between Southwest and Nelson was as follows: Debts arising under the 8/27/47
agreement
$256,255.06
Other Debts
27,173.35
Total Debts
$283,428.41
Capital Contributions
Original paid-in capital
$ 2,000.00
Subsequent advances
per books
$72,600.57
Less amounts
included in
debts above
$2,308.00
796.99
3,104.99
69,495.58
Total
$71,495.58 *
Property Received Upon Dissolution of Southwest When Southwest was dissolved at the end of 1949, it distributed to Nelson its remaining property consisting of real property with a basis of $60,029.66 and personal property with a basis of $5,075.64. Although Nelson valued the real property at $25,000 on his return he does not contest the Commissioner's determination that the real property had a value of $38,050. Concerning the personal property, the petitioner valued it in his return at $5,075.64, the book value, and the Commissioner in his *102 determination valued it at the same amount. The petitioner now contends that the value of the personal property did not exceed $3,500. The record, although somewhat vague on this point, shows that personal property consisted of deposits with utility companies of about $4,300, a small amount of cash, and certain mortgages and notes receivable. Petitioner testified that he only collected $3,500 of the deposits and that the utility companies informed him that was all he would receive. Petitioner also testified that he did not recall collecting any receivables but that Holmquist may have collected them on his behalf. Giving effect to the fact that all of the deposits were not realized, we have found as a fact that the fair market value of the personal property received by Nelson upon the dissolution of Southwest was $4,300. The fair market value of the total property received by Nelson at the end of 1949 upon the dissolution of Southwest was, therefore, $42,350 ($85,050 plus $4,300). This amount must be applied against the total debt of $283,428.41, supra, owed Nelson by Southwest. This would leave a debt of $241,078.41 ($283,428.41 minus $42,350) which became worthless in 1949, and of *103 which petitioner has never made any recovery. Realty, like Southwest, had an authorized paid-in capital of $2,000. Realty's business, general insurance and real estate, did not require a large investment but relied largely on personal services. Nelson, however, allowed Realty's employees to state that he (Nelson) was behind Realty if any question over Realty's credit arose. Nelson also advanced funds to Realty at various times. These advances were recorded as accounts payable on Realty's books. The balance in this account on Realty's books at the end of the following years is as follows: Year
Amount
1946
$ 1,885.00
1947
8,254.64
1948
22,623.23
1949
5,853.10
1950
29,992.03
The balance shown at the end of 1949 is the balance after the amount owing Realty by Southwest ($27,173.35) had been charged to Nelson's account. In addition to the $29,992.03 which Realty's books showed that Nelson had advanced by the end of 1950, Nelson advanced an additional $2,260.28 to pay certain debts of Realty in 1950, which were not recorded on its books. The total advances exclusive of the $2,000 original capital was $32,252.31 ($29,992.03 plus $2,260.28). As with the $69,495.58 * advanced directly to Southwest by Nelson, *104 very little evidence has been introduced regarding the direct advances to Realty. We do not know the time, the manner, or any of the circumstances regarding these advances. It appears that the advances were not represented by notes or other evidences of indebtedness, that no provisions for interest were made, and that the advances were not secured. These advances were completely subordinated to the liabilities to other creditors. None of the normal creditor precautions were taken by Nelson in advancing these funds. It seems to us that the advances were placed at the risk of the business and that there was no reasonable expectation of repayment. This latter fact is made evident by the fact that a substantial portion of the advances was made after Realty lost its largest account - Southwest. Under these circumstances, we are unable to make a finding that when Nelson advanced these funds there was an intention to create a debt. We think the petitioner's proof has fallen short of establishing that these amounts represented debts rather than capital contributions as the Commissioner has *105 determined. There is still the further question of the year of the loss. With the dissolution of Southwest at the end of 1949 Realty lost its largest account. It was insolvent at the time. Although the record does not show the extent of Realty's other business, indications are that it was not extensive. Under these circumstances, we think that Nelson's advances to Realty at the end of 1949 can be considered worthless at that time. The advances as of that date consisted of $2,000 original capital contribution and the subsequent advances of $5,853.10 which we have also held to be a contribution to capital. In addition, Nelson, in 1949, paid Realty's rent to Building in the amount of $4,452. This amount is included in the total advances at the end of 1950, but the entries were not made to include it in the advances at the end of 1949. However, since the amount was paid in 1949, we will treat it as being included in the advances at the end of 1949. **
The balance of petitioner's loss, $21,947.21 ($32,252.31 minus $5,853.10 minus $4,452 ***) we hold is deductible in *106 1950. Business or Nonbusiness Bad Debt As stated previously, the question of whether the $241,078.41 indebtedness due from Southwest to petitioner represents a business or a nonbusiness bad debt remains. Section 23(k)(1) allows a deduction in full for business bad debts while a nonbusiness bad debt, which is defined as "a debt other than a debt * * * the loss from the worthlessness of which is incurred in the taxpayer's trade or business," is deductible as a short-term capital loss under section 23(k)(4). Petitioner apparently recognizes the usual rule that loans to a corporation by a shareholder or officer constitute nonbusiness bad debts. Se Wheeler v. Commissioner, 241 Fed. (2d) 883, 884 (C.A. 2, 1957). Petitioner, however, seeks to bring himself within the rule of the so-called "promoter" cases arguing that "he was so extensively engaged in the operation and direction of Southwest Land and the Realty Company, from the time those corporations were organized, that his activities constituted the conduct of a business." Petitioner misconceives the nature of his activities. He *107 was not continually seeking out business opportunities. See Giblin v. Commissioner, 227 Fed. (2d) 692 (C.A. 5, 1956). He was not in the business of promoting and financing corporations - he was merely an investor in and an officer of Southwest and Realty. He devoted his full time to being an officer of these corporations and the other corporations in which he held investments. His advances and guarantees were not made in order to further any independent promoting business; they were made for the purpose of assisting the corporations in their respective businesses. Wheeler v. Commissioner, supra.Cf. Holtz v. Commissioner, 256 Fed. (2d) 865 (C.A. 9, 1958), June 12, 1958. Petitioner also contends that he was engaged in a joint venture with Southwest. There are, however, no facts in the record upon which we could base such a finding. Also, the record does not show that petitioner was engaged in any other business, such as the guaranty or money lending business, to which the bad debt loss would be proximately related. Accordingly, we uphold the Commissioner's contention regarding the nature of the bad debt. We hold it was a nonbusiness bad debt. The petitioner has made a variety of *108 claims, some of which are in the alternative, regarding the various items involved. Since all of them have not been discussed in connection with our holdings on the various issues, we will discuss them separately hereafter. (1) Petitioner contends that if, as the Commissioner originally determined, the losses on account of the loans from Investors, Connecticut, and Bank were losses of capital contributions then it logically follows that petitioner borrowed the money and contributed it to Southwest's capital and that he is, therefore, entitled to deductions for all of the interest and expenses connected with those loans. As we stated previously, we do not think the conclusion urged by petitioner necessarily follows from the Commissioner's determination. Hoyt v. Commissioner, supra. In any event, since we have not upheld the Commissioner's determination in this respect, the point is irrelevant. (2) Employing reasoning similar to that in Point (1), the petitioner urges that petitioner borrowed a portion of total loans from Investors, Connecticut, and Bank (the portion which he was forced to pay) and is entitled to a deduction for a proportionate part of the interest and expenses. Like *109 Point (1), this contention is not sound and is also irrelevant in view of our holding. The petitioner in his reply brief has also recognized the weakness of the argument. (3) Petitioner contends that the total loss sustained by him in 1949 with respect to Southwest is understated in the notice of deficiency by the following amounts: (a) Overstatement of fair market
value of personal property re-
ceived upon dissolution of South-
west ($5,075.64 minus $3,500)
$ 1,575.64
(b) Title insurance premiums paid by
Nelson in connection with Bank
loan
631.25
(c) Legal fee paid by Building and
charged to Nelson
1,020.00
(d) Amounts owing by Southwest to
Realty at 12/31/49
27,173.35 Items (a), (c), and (d) have been discussed previously. Concerning Item (b), we think that the $631.25 should be added to the bad debt losses of 1949. It has been stipulated that petitioner paid this amount but no mention was made concerning whether Southwest had recognized its liability to Nelson for making the payment. However, after examining Southwest's profit and loss statement for 1949, it does not appear that Southwest charged the amount as an expense on its books. Therefore, it is in all probability not included in the $72,600.57 *110 representing Nelson's advances to Southwest. In these circumstances, we think this amount should be treated as an additional nonbusiness bad debt loss on the theory that it was Southwest's obligation (because it was the primary obligor of the Bank loan) and that when it could not reimburse Nelson he suffered a loss. (4) Petitioner contends that the loss sustained by him with respect to Realty was understated in the notice of deficiency and the amounts paid by him as of December 31, 1949, were losses sustained by him not later than 1949. The amounts are as follows: (a) Amount due Realty by Southwest
(alternative if entries not given
effect)
$27,173.35
(b) Net advance by Nelson as of
12/31/49
5,853.10
(c) Original paid-in capital
2,000.00
(d) Rent due Building by Realty as
of 8/31/49
4,452.00 There is no need to discuss Item (a) since we have allowed Nelson a loss in Southwest to that extent. Nor is there need to discuss Items (b), (c), and (d), since we have allowed those amounts as 1949 losses. * *111 (5) Petitioner contends that he is entitled to an ordinary deduction in 1949 in the amount of $9,617.99, representing net advances to ($5,165.99), and payment for ($4,452, rent), Realty in that year. Regarding the former amount, the petitioner computes it by taking the advances as of December 31, 1949 ($5,853.10), and deducting therefrom $687.11 representing the advances as of December 31, 1948 ($22,623.23), less the amount due from Southwest at December 31, 1948 ($21,936.12). The basis of this contention is the disregarding of Realty as a taxable entity after December 31, 1948. Although we know that Realty was insolvent [18] at that date and that it sustained a loss in 1949, we do not think this would justify us in disregarding its corporate entity. Petitioner's contention in this respect is not sustained. (6) Petitioner contends that he had, by no later than December 31, 1949, become personally liable for business transacted in *112 the name of Realty; that thereafter it (Realty) should not be treated as a separate entity for tax purposes; and that payment by him in 1950 in the sum of at least $21,947.21 should be allowed as a deduction against ordinary income for that year. What we said in regard to Point (5) is equally applicable here. The fact that Nelson may have advanced funds to Realty does not require us to disregard Realty as a taxable entity. If Nelson regarded himself as responsible for Realty's debts and made good those debts it was because Realty was not adequately capitalized. But the facts remain that Realty was incorporated, did business as a corporation, and was treated by the petitioner, its sole shareholder, as a separate entity. In these circumstances, there is no basis upon which we could or should disregard its corporate existence. (7) Petitioner contends that Southwest should not be treated for tax purposes as a separate entity after May 14, 1947, or at least June 9, 1949, but should be treated as his nominee or agent to liquidate a business enterprise conducted in the name of Southwest. As with Realty, there is no basis in the record for disregarding the existence of Southwest. The parties *113 themselves did not disregard Southwest. There was no plan to dissolve Southwest until late in 1949. There was no indication that it would be dissolved until it actually happened. After the 25 houses were sold, Southwest still held a considerable number of lots which it could have built upon. Southwest was not a sham corporation. It held real estate, developed it, borrowed money, and sold the houses. These activities constitute a business, even though the business was unsuccessful. The fact that Southwest would have been bankrupt in 1947 were it not for Nelson's part in procuring the Investors loan does not change the result. He was acting to protect his own investment in Southwest. After that time, Nelson continued to recognize Southwest's separate existence. The fact that Southwest had no credit standing and had to rely upon Nelson's guarantees only tends to show that Southwest was inadequately capitalized from the start. Discussion of petitioner's Points (8), (9), and (10) dealing with business bad debts, nonbusiness bad debts, and method of accounting are unnecessary in view of our previous discussion. In his reply brief, petitioner raises several additional points contending that *114 he is entitled to deductions under section 23(b) (interest); 23(a)(1) (ordinary and necessary business expenses); 23(a)(2) (ordinary and necessary nonbusiness expenses for collection of income); 23(e)(2) (loss on transaction entered into for profit) for amounts which he paid, or caused to be paid, or were paid out of the proceeds of the sale of his property or which he bore the economic burden of. Many of the items claimed as deductions under these sections were not paid by Nelson but were paid by Southwest and Realty. The fact that Nelson, as sole stockholder of Southwest and Realty, bore the ultimate burden of expenses and losses has already been discussed and decided in this Opinion. The amounts which Nelson advanced directly to Southwest and Realty do not fall within any of the above categories - they have all been held to be capital contributions. The only other payments by Nelson which resulted in losses were the payments under the August 27, 1949, agreement. We have previously discussed the facts concerning each item under that agreement and have held the payments representing Southwest were guaranty payments which resulted in bad debt losses when Southwest, the primary obligor, *115 was not able to reimburse Nelson, the guarantor. Decision will be entered under Rule 50. Footnotes
1. For the year 1950 income taxes withheld in the amount of $2,494.20 reduce the amount due under the deficiency notice to $2,791.84 ($5,286.04 minus $2,494.20).↩
2. All section references are to the Internal Revenue Code of 1939, as amended.↩
*. Last sentence added by an official order of the Tax Court, dated November 21, 1958 and signed by Judge Black.↩
3. It was also agreed that the interest rate on the Investors loan should be increased from 5 per cent to 6 per cent commencing May 14, 1948. ↩
4. The discrepancy between the amount originally charged to Southwest and the amount subsequently charged to Nelson is unexplained.↩
5. This finding is in accord with #13 of the stipulation. However, #20 of the stipulation provides $11,779.59, representing interest accrued but unpaid at December 31, 1948, on the Investors loan, was paid out of the proceeds of the Bank loan. Petitioner, in his reply brief, concedes that #13 is correct and that this interest was paid from the proceeds of the sale of Southwest property in 1949.
6. The balance of the Bank loan was reduced to $107,106.02 by November 30, 1949, by application of the proceeds from the sale of houses and lots.
*. Last part of sentence, which is after the word "record", was added by an official order of the Tax Court, dated November 21, 1958 and signed by Judge Black.↩
1. Includes interest of $5,682.94.↩
*. Changed by an official order of the Tax Court, dated November 21, 1958 and signed by Judge Black. Originally read "Rent owed by Realty (not shown by record). **. This paragraph was added by an official order of the Tax Court, dated November 21, 1958 and signed by Judge Black.↩
***. Sentence added by an official order of the Tax Court, dated November 21, 1958 and signed by Judge Black.↩
1. Net after deducting $10,258.75 for sales commissions paid to Engel. 2. This amount consists of $15,270.79 paid to Bainbridge & Mims out of proceeds of Bank loan for services performed by that firm in connection with loan from Investors and $2,308 for services rendered by Tucker & Prince to Nelson and Southwest in connection with the loans from Investors, Connecticut and Bank. Building charged Nelson for $2,308 which Tucker & Prince owed to Building for rent. ↩
3. This amount includes interest of $11,471.28 on the Investors and Bank loan and interest of $2,817.45 on the Connecticut loan. ↩
4. The amount represents a portion of the $2,400.85 expense paid by Building in 1948 in connection with the Connecticut loan. ↩
5. Difference between book value ($60,029.66) of remaining lots and the amount that Nelson deemed they were worth ($25,000) when he received them upon dissolution, infra.↩
7. The parties have stipulated that the book value was $60,029.66. However, it appears that $35,029.66 of that amount was written off in 1949 by Southwest as a loss, thereby leaving a book value of $25,000 which is equal to the amount that Nelson used as fair market value when he received the lots upon dissolution. a1 Word changed by an official order of the Tax Court, dated November 21, 1958 and signed by Judge Black. Originally read "accruable".
8. As can be seen the operating loss of $32,252.31 (exclusive of the $2,000 capital stock) differs from the $31,992.03 shown on the balance sheet. The discrepancy is unexplained. The former amount which was stipulated will be treated as the actual loss.↩
9. As can be seen the petitioner claimed a loss on the Southwest venture in the amount of $308,486.52 (business bad debt of $306,486.52 plus capital loss of $2,000). Since the respondent computed the loss to be $283,605 there is a difference of $24,881.52 ($308,486.52 minus $283,605). This difference is not entirely explained. However, from certain allegations in the original petition (which were denied by respondent, apparently as a matter of course) the difference appears to result from the following: Respondent reduced claimed loss as follows: Increase in value of real property received (petitioner valued real↩
10. The record does not show the amount that the proceeds of Nelson's sale of the Estate stock were reduced by because of the assumption by Estate of the various liabilities of Southwest and Realty. Nelson's "payment" is, of course, only equal to the amount of such reduction. We assume, as both parties apparently do, that the proceeds were reduced by the full amount of each liability assumed. For convenience we will, therefore, refer to the various liabilities assumed by Estate as being "paid" by Nelson.
11. The stipulation (#16) reads: "(1) to pay principal, interest and other expenses on the obligation to Connecticut General Life Insurance Company, which were ascertained to total $130,024.05 plus $796.99." There is no evidence that Building owed Connecticut that amount. If the terms of the note evidencing the Connecticut loan were followed, and we must assume that they were, the amount Building owed Connecticut at August 27, 1949, was substantially less than the $130,821.04 ($130,024.05 plus $796.99) because of the installment payments. We regard the $130,821.04 as the amount which was charged on Building's books to Nelson because of the amount it borrowed from Connecticut together with the interest and expenses on the loan. Petitioner apparently is of the same view.
12. See Restatement of Security, sec. 104↩; Code of Alabama (1940) Title 9, sec. 81. 13. It does not appear that any question of separate treatment for principal and interest was raised. However, if the Court thought the two should have received separate treatment it could have raised the point, sua sponte.↩
14. The parties have stipulated that the $30,053.81 advances as of December 31, 1947, as a part of the $72,600.57, the balance at December 31, 1949. The balance sheet at December 31, 1947, shows that the advances by Nelson were reduced to $29,740.08 as of that date. Therefore, there must have been a repayment during the year and the entire $30,053.81 could not be included in the $72,600.57. However, in view of the stipulation we will treat the amount of $30,053.81 as a contribution to capital. a1 The words "and $796.99" added by an official order of the Tax Court, dated November 21, 1958 and signed by Judge Black. a2 The words "and included in the $72,600.57" added by an official order of the Tax Court, dated November 21, 1958 and signed by Judge Black.↩
15. Although the advances were treated on the books as accounts payable they were shown on the balance sheets of December 31, 1946, and December 31, 1947, as paid-in capital. The balance sheets for December 31, 1948, and December 28, 1949, were not introduced in evidence, but there is no reason to believe that they were shown in any different manner.↩
16. Realty's books showed that Southwest owed it $26,501.28 plus $672.07 while Southwest's books showed that it (Southwest) owed Realty $26,501.28. The discrepancy is unexplained. Both parties apparently treat the Realty books as correctly reflecting the account between Southwest and Realty. We do also.↩
17. Respondent also denies that Realty continued to owe Nelson the $27,173.35.↩
*. Table changed by an official order of the Tax Court, dated November 21, 1958 and signed by Judge Black.↩
*. Figure changed by official order of the Tax Court, dated November 21, 1958 and signed by Judge Black.↩
**. Last three sentences were added by an official order of the Tax Court, dated November 21, 1958 and signed by Judge Black.↩
***. Figures changed by official order of the Tax Court, dated November 21, 1958 and signed by Judge Black.↩
*. Amended by an official order of the Tax Court, dated November 21, 1958 and signed by Judge Black. The amendment changed the last sentence of the preceding paragraph and deleted the paragraph immediately following.
18. Petitioner argues that Realty was without assets of substantial value at December 31, 1948. However, it appears to us that the fact is insignificant since Realty was in a business where substantial assets are not required for successful operation.↩